1             IN THE UNITED STATES DISTRICT COURT

2                DISTRICT OF ARIZONA

3

4  United States of America           MJ-18-3091-TUC-JR

5  vs.

6  Joshua Joel Pratchard,          June 8, 2018
                                   10:55 a.m.
7         Defendant.          Tucson, Arizona
   _____

8

9         OFFICIAL TRANSCRIPT OF PROCEEDINGS

10            DANGEROUSNESS HEARING

11     BEFORE THE HONORABLE ERIC J. MARKOVICH
        UNITED STATES MAGISTRATE JUDGE

12

13          A P P E A R A N C E S

14  For the Government:

15      Beverly K. Anderson
      United States Attorney's Office
16      405 West Congress
      Tucson, Arizona 85701
17

18  For the Defendant:

19      Jay Aaron Marble
      Federal Public Defender's Office
20      407 West Congress
      Suite 501
21      Tucson, Arizona 85701

22        PROCEEDINGS WERE DIGITALLY RECORDED

23

24      TRANSCRIBED BY:  ERICA R. McQUILLEN, RDR, CRR
           405 West Congress, Suite 1500
25            Tucson, Arizona 85701
              (520) 205-4267

```
1                        EXAMINATION INDEX

2   RYAN McGEE
              DIRECT BY MS. ANDERSON . . . . . . . . . . . . .   4
3             VOIR DIRE BY MR. MARBLE . . . . . . . . . . . .  39
              FURTHER DIRECT BY MS. ANDERSON . . . . . . . . .  40
4             CROSS BY MR. MARBLE . . . . . . . . . . . . . .  59
              REDIRECT BY MS. ANDERSON . . . . . . . . . . . .  82
5             FURTHER BY MR. MARBLE . . . . . . . . . . . . .  92

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                     P R O C E E D I N G S
 2            THE CLERK:  Calling case 18-MJ-3091, United States
 3  of America vs. Joshua Joel Pratchard, on for detention
 4  hearing.
 5            Counsel, please state your appearances.
 6            MS. ANDERSON:  Beverly Anderson for the United
 7  States.  Good morning.
 8            THE COURT:  Good morning.
 9            MR. MARBLE:  Good morning, Your Honor.  Jay Marble
10  appearing with Joshua Pratchard.  He's present, in custody,
11  Your Honor.
12            THE COURT:  Okay.  Good morning to you both.
13            Okay.  So we're on for the dangerousness hearing.
14  Looks like the Government has one witness.  Is that right?
15            MS. ANDERSON:  That's correct.
16            THE COURT:  Okay.  Mr. Marble, do you think you'll
17  have witnesses?
18            MR. MARBLE:  No, but I do have some documents.
19            THE COURT:  Okay.  I just wanted to make sure -- I'm
20  sorry.  Go ahead.
21            MR. MARBLE:  Unless -- with one caveat.  One of the
22  documents that I have submitted, Your Honor, is a disk which
23  contains some YouTube videos regarding Mr. Pratchard's
24  nonprofit in San Diego.  The Government wanted a little
25  additional time.  I would have a witness only to lay the
```

1  foundation to the admission if necessary.  I'm not sure that's

2  even necessary at this hearing, but just in case.

3           THE COURT:  Okay.  All right.  I just wanted to

4  check on the rule of exclusion, but it sounds like we don't

5  need to worry about that.

6           So okay.  So Ms. Anderson, do you want to call your

7  witness?

8           MS. ANDERSON:  Sure.  The Government calls Special

9  Agent Ryan McGee.

10                 RYAN McGEE, WITNESS, SWORN

11                      DIRECT EXAMINATION

12 BY MS. ANDERSON:

13 Q.   Sir, could you tell us your name and occupation.

14 A.   My name is Ryan McGee.  I'm a special agent with the FBI.

15 Q.   How long have you been with the FBI?

16 A.   A little over six years.

17 Q.   Before we talk about what you do at the FBI, could you

18 tell us a little bit about your background, such as your

19 education and your prior employment history.

20 A.   Yes, ma'am.  I went to undergraduate at Stetson

21 University in DeLand, Florida.  I received a B.A. in history

22 and a B.S. in psychology.  I then went to grad school at the

23 University of Florida where I received a master's in

24 international relations.

25      After -- after college I went to -- I joined the United

 1   States Marine Corps, serving as an officer.

 2   Q.   And what rank did you ultimately attain in the Marine

 3   Corps?

 4   A.   I was a captain.

 5   Q.   Now, at some point you were called back to duty to -- to

 6   serve again in Afghanistan; is that correct?

 7   A.   Yes, ma'am.  I was recalled back to duty between December

 8   2013 and July of 2014.

 9   Q.   Now, let's go back to your FBI experience and what you do

10   specifically.  What unit are you assigned to?

11   A.   I'm a member of the joint terrorism task force, NS5, here

12   in Tucson.

13   Q.   And what kind of cases do you investigate?

14   A.   Mainly domestic terrorism.

15   Q.   Do those domestic terrorism investigations include

16   investigations into militia groups?

17   A.   Yes, ma'am, they do.

18   Q.   Could you explain to us what a militia group is.

19   A.   A militia group is essentially an irregular military

20   force.  Essentially it's armed civilians that are united by a

21   common ideology.

22   Q.   Why is it that militia groups get the attention of the

23   FBI?

24   A.   Militia groups get the attention of the FBI due to

25   possible violations of federal laws.

1   Q.   Now, we're going to be talking about a specific militia

2   group during this case, and that's the Arizona Border Recon;

3   is that correct?

4   A.   Yes, ma'am.

5   Q.   Are you familiar with AZBR?

6   A.   Yes, ma'am, I am.

7   Q.   Could you describe to us a little bit about AZBR and what

8   their philosophy is.

9   A.   Arizona Border Recon was formed in 2011.  It's run by a

10  gentleman by the name of Tim Foley.  Their main issue is

11  illegal immigration along the southern U.S. border.

12  Q.   What's their operational goal?

13  A.   Their operational goal is to prevent or stop or slow down

14  illegal immigration across the border.

15  Q.   Does AZBR have any kind of application process, or can

16  anyone just go and patrol the border with them?

17  A.   Yes, ma'am.  They -- usually, to join AZBR, you will

18  submit an application online, which is then reviewed by

19  Mr. Foley, at which point he will determine -- he determines

20  if somebody is allowed to come out and join one of their

21  border operations on a probationary basis, to see if they have

22  what Tim Foley requires for people to serve in further border

23  operations.

24  Q.   Does Tim Foley and AZBR have any kind of rules or

25  restrictions?

1    A.    They do.  They publish their rules and regulations

2    online.

3    Q.    And what are those?

4    A.    They -- essentially they are very specific on what type

5    of weapons can be brought out.  Tim Foley does not allow

6    silencers or optics on weapons, and he also is against, in

7    most cases, detaining suspected undocumented immigrants.

8    Q.    Now, the FBI has a confidential human source that reports

9    on militia matters in the southwest; is that correct?

10   A.    That is correct.

11   Q.    In late January of this year and extending into early

12   February of this year, did you receive information from the

13   source regarding an individual by the name of Joshua

14   Pratchard?

15   A.    We did.

16   Q.    And could you tell us specifically what information you

17   received from the source.

18   A.    We received information that Mr. Pratchard was attending

19   one of these operations and became visibly angry at certain

20   moments when he was informed that he was not allowed to have a

21   silencer on his weapon and also that he was not allowed to go

22   hands-on, meaning physically, physically detain or otherwise

23   restrain any suspected undocumented immigrants.

24   Q.    So based on your answer, I understand that Mr. Pratchard

25   actually came out to Arizona from San Diego and participated

1   in a border operation; correct?

2   A.   That is correct.

3   Q.   And where does Mr. Pratchard live?

4   A.   Mr. Pratchard lives in San Diego, California.

5   Q.   All right.  And when was it that Mr. Pratchard

6   participated in the Arizona Border Recon operation?

7   A.   He participated in the operation from around January 27th

8   until February 1st of this year.

9   Q.   Was that the only time that he participated in a border

10  operation with AZBR?

11  A.   Yes, it was.

12  Q.   And why is it?  Why is it that he only participated that

13  one time?

14  A.   From CHS reporting, based on his actions and behavior

15  during the operation, he was not allowed back to attend any

16  further operations.

17  Q.   And is that because what you testified previously, that

18  he got angry, he wanted to use different kinds of weapons than

19  what were allowed?

20       Is that correct?

21  A.   That's correct.

22  Q.   Now, when you received this information from the source

23  about this individual, Mr. Pratchard, that he had come out and

24  that he acted in a certain way that was inappropriate and he

25  was not allowed to participate any longer in the AZBR, what

 1   did you do?

 2   A.   We looked into -- we were given his cell phone number,

 3   and then through his cell phone number, we looked into his

 4   criminal history.

 5   Q.   Okay.  And let's talk about his criminal history.  You've

 6   had a chance to review documents that pertain to the

 7   defendant's criminal history, have you not?

 8   A.   I have.

 9   Q.   Now, first of all, the defendant was convicted in the

10   military system of a crime punishable by imprisonment for a

11   term exceeding one year; is that correct?

12   A.   That is correct.

13   Q.   Take a look at Government's Exhibit No. 1.

14   A.   I have it.

15   Q.   Oh, okay.  Do you recognize that document?

16   A.   Yes, ma'am, I do.

17   Q.   You've reviewed it previously, have you not?

18   A.   I have.

19   Q.   Now, Mr. Pratchard, who is currently the defendant in

20   this case, has a date of birth of 12/10/80.

21        Is that correct?

22   A.   That is correct.

23   Q.   And his Social Security Number is 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?

24   A.   That is correct.

25   Q.   Now, does that information connect up with the individual

1  that's the subject of Government's Exhibit No. 1?

2  A.   It is.

3  Q.   So it appears to be the same individual; is that right?

4  A.   That is correct.

5  Q.   According to the documents in Government's Exhibit No. 1,

6  when did the defendant enlist in the Marines?

7  A.   He enlisted in the Marine Corps on April -- I'm sorry --

8  August 10th of 1999.

9  Q.   And according to Exhibit 1, the defendant was charged

10 with numerous criminal offenses in the Uniform Code of

11 Military Justice, and he was convicted of some of those

12 offenses; correct?

13 A.   Yes, ma'am, he was.  He was convicted in a general court-

14 martial under the UCMJ.

15 Q.   He was convicted on April 9th of 2002; is that correct?

16 A.   That is correct.

17 Q.   Based on your review of the documents, what was he

18 convicted of?

19 A.   He was convicted of four counts.  One was the use of

20 ecstasy, and the other three counts were distribution of

21 ecstasy.

22 Q.   And those charges carried a criminal penalty that

23 exceeded one year in custody; correct?

24 A.   That is correct.

25 Q.   And ultimately Mr. Pratchard, the defendant in our case,

RYAN McGEE -- DIRECT EXAMINATION                    11

1   was sentenced to imprisonment; correct?

2   A.   That is correct.

3   Q.   For how long?

4   A.   Three years.

5   Q.   And that matter was affirmed on appeal on June 15th of

6   2005; correct?

7   A.   That is correct.

8   Q.   And according to documents in Government's Exhibit No.

9   1, which is the President of the Naval Clemency Board decision

10  letter dated 2/13/03, no clemency was granted to the

11  defendant; correct?

12  A.   That is correct.

13          MS. ANDERSON:  Government moves for admission of

14  Exhibit No. 1.

15          THE COURT:  Any objection?

16          MR. MARBLE:  No objection.

17          THE COURT:  Okay.  Exhibit 1 will be admitted.

18  BY MS. ANDERSON:

19  Q.   Now, the defendant has a second felony conviction, does

20  he not?

21  A.   He does.

22  Q.   Let's take a look at Government's Exhibit No. 2.

23  A.   Okay.

24  Q.   The defendant was involved in an altercation with another

25  individual on October 13th of 2007; correct?

1   A.    That is correct.

2   Q.    And you've had a chance to review the documents in

3   Exhibit 2?

4   A.    I have.

5   Q.    Are the dates of birth and the Social Security Number for

6   the -- for this defendant, Mr. Pratchard, coincide and match

7   with those of the individual listed in Exhibit 2?

8   A.    They do.

9   Q.    So in other words, Exhibit 2, the documents in Exhibit

10  2, pertain to our defendant, Mr. Pratchard; correct?

11  A.    That is correct.

12  Q.    Now, you've had a chance to review Exhibit No. 2.  Could

13  you describe the altercation for us.

14  A.    The altercation took place at we believe an Oktoberfest

15  public gathering.  Mr. Pratchard and two of his associates

16  approached -- approached the victim, and he was punched and

17  then fell to the ground, at which time Mr. Pratchard stomped

18  on the victim's face with his foot.

19  Q.    And did law enforcement personnel arrive at the scene?

20  A.    They did.  Law enforcement was the ones that pulled

21  Mr. Pratchard off of the victim.

22  Q.    And what did they describe when they pulled Mr. Pratchard

23  off of the victim?

24  A.    The victim -- the victim suffered a broken nose, a

25  fractured jaw, and a concussion.

1    Q.    Was he laying in a pool of blood?

2    A.    He was.

3    Q.    Now, the victim was taken to the hospital, was he not?

4    A.    He was.

5    Q.    And Government's --

6          MR. MARBLE:  Your Honor, I'm just going to object at

7    this time.  I feel like we need a little more foundation based

8    upon the testimony of this witness to the documents.  I'm not

9    sure the foundation of where -- if he did other investigation

10   or if he just based it on the documents.

11         THE COURT:  Yeah, okay.  Could you just clarify

12   those with the witnesses, Ms. Anderson.

13         MS. ANDERSON:  Sure.

14   BY MS. ANDERSON:

15   Q.    Now, when we found out that Mr. Pratchard had several

16   felony convictions, we reached out to different law

17   enforcement agencies to obtain records, did we not?

18   A.    We did.

19   Q.    In fact, the very first page of Government's Exhibit No.

20   2 seems to be a fax page from the United States Park Police

21   from the San Francisco field office; is that correct?

22   A.    That is correct.

23   Q.    And they were sent to Dean Ross, who is your cocase

24   agent; is that right?

25   A.    That is correct.

RYAN McGEE -- DIRECT EXAMINATION                    14

1   Q.   And you've had a chance to look at the documents in

2   Exhibit 2 and compare the dates of birth and other

3   identification factors with our defendant; correct?

4   A.   I have.

5   Q.   Is there any doubt that Exhibit 2 pertains to our

6   defendant?

7   A.   No, ma'am.

8   Q.   And again, you've read the statements and -- in the

9   report; correct?

10  A.   I have.

11  Q.   And defense counsel and the Court has a copy of the

12  reports for their own review, but we also obtained photographs

13  of the victim, did we not?

14  A.   We did.  They're included in the report.

15  Q.   In fact, in advance, the page in advance of the

16  photograph, is another email from one of the investigators

17  from the U.S. Park Police saying, "Attached are copies of the

18  colored pictures related to the case faxed to you earlier this

19  afternoon."

20       Correct?

21  A.   Correct.

22  Q.   Now, according --

23            MS. ANDERSON:  Government moves for admission of

24  Exhibit 2.

25            THE COURT:  Mr. Marble?

1              MR. MARBLE:  I would object to the admission of the

2    entire Exhibit 2.  It contains many things.  I would object to

3    the photographs, Your Honor, and I would object to the police

4    -- the police reports and handwritten notes, just for lack of

5    either authenticity or lack of foundation.  I think we might

6    be getting into various levels of hearsay with those

7    documents.

8              THE COURT:  Okay.  The objection will be overruled.

9    Exhibit 2 will be admitted.

10   BY MS. ANDERSON:

11   Q.   Let's take a look at Government's Exhibit No. 3.

12        The defendant was ultimately indicted in federal court in

13   the Northern District of California; correct?

14   A.   Correct.

15   Q.   And that was as a result of the events described in

16   Exhibit 2; is that correct?

17   A.   That's correct.

18   Q.   And when was Mr. Pratchard indicted in the Northern

19   District of California?

20   A.   August 19th of 2008.

21   Q.   And that was in CR-08-0553?

22   A.   That is correct.

23   Q.   And what was the charge that he was indicted on?

24   A.   He was charged with one felony count of assault resulting

25   in serious bodily injury.

1            MS. ANDERSON:  Government moves for admission of

2    Exhibit 3.

3            MR. MARBLE:  No objection.

4            THE COURT:  Okay.  3 is admitted as well.

5    BY MS. ANDERSON:

6    Q.   Let's take a look at Government's Exhibit No. 4.  What is

7    that?

8    A.   Exhibit No. 4 is the judgment documentation relating to

9    the case in Northern California.

10   Q.   And it reflects that the defendant was convicted on

11   October 21st of 2009 of assault resulting in serious bodily

12   injury; is that correct?

13   A.   That is correct.

14   Q.   And again, that was a felony; is that right?

15   A.   Yes, ma'am.

16   Q.   Now, what was his sentence?

17   A.   He received a sentence of 36 months probation, as well as

18   slightly under $20,000 of restitution.

19   Q.   He was also ordered to reside for a period of 12 months

20   in a community confinement facility; is that right?

21   A.   That's correct.

22           MS. ANDERSON:  Government moves for admission of

23   Exhibit 4.

24           MR. MARBLE:  No objection.

25           THE COURT:  4 is admitted.

1   BY MS. ANDERSON:

2   Q.   Let's take a look at Government's Exhibit No. 5.  Have

3   you had a chance to look at those reports?

4   A.   One second.

5        Yes, ma'am, I have.

6   Q.   And according to Exhibit No. 5, the defendant was

7   arrested for domestic violence on March 9th of 2014; is that

8   correct?

9   A.   That is correct.

10  Q.   Have you had a chance to review the document,

11  Government's Exhibit No. 5?

12  A.   I have.

13  Q.   And once again, the document provides a date of birth and

14  other identifying factors for the individual that was

15  arrested; is that correct?

16  A.   It does.

17  Q.   And that matches with our defendant, does it not?

18  A.   It does.

19  Q.   Now, you've had a chance to look at the -- at the

20  documents.  Could you describe the events as set forth in

21  Exhibit 5.

22  A.   Yes, ma'am.  The background of this is that --

23        MR. MARBLE:  I'm sorry.  Your Honor, just for the

24  record, I believe the witness is reading the documents.  I

25  think he has to testify by memory or advise us that he can't

1   remember by recollection and needs to refresh his

2   recollection.  I don't think he can read the documents into

3   the record, Your Honor.

4           THE COURT:  Okay.  So if you can testify to what

5   your recollection is, and if you need to refer to your -- the

6   reports to refresh your recollection, just let us know when

7   you're doing that.  Okay?

8           THE WITNESS:  Yes, sir.

9           THE COURT:  Okay.  The background -- the background

10  of this is Mr. Pratchard was arrested on March 9th of 2014

11  regarding battery of his current spouse, Melissa Pratchard.

12          Based on -- sir, may I read the victim's statement

13  from the report?  I can provide more detail.

14          THE COURT:  Sure.  So you wouldn't know that

15  statement verbatim?

16          THE WITNESS:  No, sir, I would not.

17          THE COURT:  Okay.  So sure.

18          THE WITNESS:  Hold on one second.

19          Essentially I'll just read the statement in its

20  entirety.

21          "We went to church class.  Earlier in the class they

22  were talking a lot about marriage.  I think that Joshua felt

23  bad after leaving the class because he felt some of the things

24  they were talking about in the class that he was doing.

25          "We got home and Joshua was not talking to me.  I

1    grabbed my journal and rode my beach cruiser to the beach.  I

2    wrote in my journal for a while and then went back home.

3            "When I got home, Joshua was mad at me.  He was

4    upset that I left and I did not stay to comfort him.  He then

5    calmed down, hugged me, and apologized.  Joshua then started

6    watching television in the living room.  I went to the bedroom

7    and started to work on some homework.

8            "A short while later Joshua walked into the room" --

9    "walked into the room screaming at me.  He was upset about a

10   text that I had sent him earlier when I left explaining the

11   way I felt about the way he was acting.

12           "He left the house and then came back a short time

13   later.  He began throwing things around the house.  He

14   collected up several of his pill bottles and walked over to

15   the computer.  I began asking him why he was being so mean.

16           "I grabbed one of the pill bottles and threw it at

17   me."  I'm not sure what kind of typo that is.  "He said it was

18   my Vicodin.  The bottle hit me in the arm.  Joshua then told

19   me I needed to leave.  I told him that this was my house and I

20   was not going to leave.

21           "Joshua then got in my face and told me I had five

22   seconds to leave or he was going to hurt me.  Joshua then

23   grabbed me by both of my arms, picked me up, carried me over

24   to the" -- "over to the room and threw me on the bed.

25           "I told him I was calling the police.  He said, 'Go

1    ahead,' and walked away.  I don't want to press charges or

2    have him arrested."

3    BY MS. ANDERSON:

4    Q.   According -- according to the reports, was the defendant

5    -- the police arrived, did they not?

6    A.   They did.

7    Q.   And the defendant was arrested for domestic violence;

8    correct?

9    A.   The specific charge was battery of a spouse, but yes.

10            MS. ANDERSON:  The Government moves for admission of

11   Exhibit No. 5.

12            MR. MARBLE:  No objection.

13            THE COURT:  5's admitted.

14   BY MS. ANDERSON:

15   Q.   Now, it appears the defendant is a two-time convicted

16   felon; correct?

17   A.   That is correct.

18            MR. MARBLE:  Objection, Your Honor.  That's -- I

19   don't think the witness can make a statement regarding that.

20            THE COURT:  Well, he has two felony convictions.

21            THE WITNESS:  He does, sir.

22            THE COURT:  Okay.

23   BY MS. ANDERSON:

24   Q.   Did you check for evidence establishing that

25   Mr. Pratchard had applied for or had a right to possess a

1   firearm restored?

2   A.    We did.

3   Q.    And did you find any evidence that would indicate he had

4   his right to possess a firearm restored?

5   A.    No, ma'am, we did not.

6   Q.    That being the case, it appears that the defendant is a

7   prohibited possessor; correct?

8   A.    He is.

9   Q.    Now, let's go back to the defendant's participation in

10  the Arizona Border Recon.  He participated in a border

11  operation only once, which was the end of January of this year

12  to early February of this year; correct?

13  A.    That's correct.

14  Q.    Now, let's take a look at Government's Exhibit No. 6.

15  Have you had a chance to look at these photographs?

16  A.    I have.

17  Q.    And could you tell us about these photographs.

18  A.    These photographs were taken of Josh Pratchard and other

19  people taking part in the Arizona Border Recon op during the

20  time frame you just specified.

21  Q.    Okay.  And in each of these four photographs, is the

22  defendant -- does the defendant appear in the photograph?

23  A.    He does.

24  Q.    And could you describe for us which one is the defendant.

25  A.    The first page he is the one second from the right with

1   the -- with the helmet.  In the second picture, he is the one

2   on the right.  In the third picture, he is the one kneeling on

3   the right of the picture with the helmet.  And the last

4   picture, same thing.  He's the one kneeling all the way on the

5   right.

6   Q.   Now, in each of these photographs, he's got something on

7   top of his helmet; is that right?

8   A.   He does.

9   Q.   What's that?

10  A.   That's a night vision goggle, a PVS-14, I believe.

11           MS. ANDERSON:  Government moves for admission of

12  Exhibit No. 6.

13           THE COURT:  Any objection?

14           MR. MARBLE:  No objection.

15           THE COURT:  Okay.  6 is admitted.

16  BY MS. ANDERSON:

17  Q.   Where did we get these photographs?

18  A.   Mr. Pratchard texted these photographs to the CHS.

19  Q.   And that was shortly after he was here in the end of

20  January, beginning of February of this year; correct?

21  A.   Yes, ma'am.

22  Q.   Now, the defendant continued his relationship with the

23  source despite the fact that the defendant was not allowed to

24  participate in AZBR; correct?

25  A.   He did.

1   Q.   And according to our records, the defendant and the

2   source had contact on April 9th of this year through April

3   14th of this year and on May 30th through June 1st of this

4   year, when the defendant came to Arizona; is that correct?

5   A.   Yes.  Those are the dates of contact when the subject

6   traveled to Arizona.

7   Q.   However, from April 26th through April 28th of this

8   year, the source traveled to San Diego --

9   A.   He did.

10  Q.   -- to visit with the defendant; correct?

11  A.   Yes, ma'am, he did.

12  Q.   And he stayed in his apartment; is that right?

13  A.   In the defendant's apartment, yes, ma'am.

14  Q.   Now, each time the source and the defendant had contact,

15  an audio or video recording was made of the contact; is that

16  right?

17  A.   Of part of the contact, yes, ma'am.  The amount of

18  recording is limited by the battery power of the device.

19  Q.   So in other words, they had contact for an extended

20  period of time, and the -- and the battery would last for only

21  so long; correct?

22  A.   Correct, yes, ma'am.

23  Q.   Now, what did we learn generally about the defendant

24  during these visits that the source had with the defendant?

25  A.   That the source -- that the defendant was -- possessed

RYAN McGEE -- DIRECT EXAMINATION                24

1   firearms, that he manufactured firearms in his residence, that

2   he loaded -- that he manufactured and reloaded his own

3   ammunition, and that he was willing to sell the firearms and

4   ammunition.

5   Q.   Now, did it -- and you've read the transcripts, have you

6   not?

7   A.   I have.

8   Q.   Did it appear that the defendant had a certain

9   sophistication and knowledge about firearms?

10  A.   Yes, he did.

11  Q.   Could you explain that a little bit more.

12  A.   He was very familiar with what's called an 80 percent

13  lower.  An 80 percent lower, by the legal definition, it is

14  simply a piece of metal.  It's called an 80 percent because,

15  once you drill the two holes within the lower receiver of the

16  firearm, which houses the trigger and it has the magazine

17  well, once you mill those, legally, that is defined as a

18  firearm, which he states, he discusses at length in the

19  recordings.

20       In addition, he's also familiar with normal ammunition

21  and how to make subsonic ammunition.

22  Q.   Did he describe to the source how it is that he

23  manufactures these firearms and the ammunition and what kinds

24  of equipment he has back in his apartment?

25  A.   He does.

1   Q.   And what did he describe it as?

2   A.   The equipment?

3   Q.   Right.

4   A.   The equipment, he said in one of the recordings that he

5   has a full armory set up in his house, basically any weapon

6   you would need to manufacturer a firearm.

7   Q.   Let's look at Government's Exhibit No. 29, which is

8   portions of transcripts from the electronic monitoring of the

9   conversations between the CHS and the defendant.

10          MS. ANDERSON:   And for purposes of Judge and

11   counsel, we have two separate transcripts.   One is an audio --

12   a transcript of an audio recording.   The second is the

13   transcript of a video recording.   And I'll be talking about

14   them in chronological order.

15   BY MS. ANDERSON:

16   Q.   The first one was a conversation between the defendant

17   and the CHS on April -- between April 10th of this year and

18   April 14th of this year; is that correct?

19   A.   That's correct.

20   Q.   And again, that was an audio recording?

21   A.   Yes, ma'am.   This is an audio recording.

22   Q.   You've reviewed this transcript in detail, have you not?

23   A.   I have.

24   Q.   Let's talk about some of the conversations.   I'm not

25   going to go into each and every conversation.   I'm just going

1  to be highlighting some of the important -- some of the

2  important conversations.

3       Take a look on page four of the transcript, which, again,

4  is April 10th through April 14th of this year?

5             THE COURT:  That's the second transcript?

6             MS. ANDERSON:  It is, Your Honor.

7             THE COURT:  Okay.

8             MS. ANDERSON:  And I apologize.  They were put in

9  out of order.

10            THE COURT:  That's okay.

11 BY MS. ANDERSON:

12 Q.  Specifically, at the bottom of page four, the CHS is

13 talking about ammunition, and the CHS says, "Dude, that's some

14 ammunition.  It's hard to fucking find."

15 A.  That's correct.  The CHS was is referring to subsonic

16 ammunition.

17 Q.  Okay.  And what does the defendant respond?

18 A.  Mr. Pratchard responded, "Yeah.  That's why I make mine."

19            MR. MARBLE:  Same objection to earlier, Your Honor.

20 I think we need some clarification as to it being read in the

21 record.

22            THE COURT:  Okay.  Well, I'm not sure there is a way

23 to do it other than reading it into the record.

24            MR. MARBLE:  No, it just needs to be clear on the

25 record.

1          THE COURT:  Okay.  So when you are reading from the

2    transcript, will you just kind of reference that you're not

3    summarizing, you're reading directly from the transcript.

4          THE WITNESS:  Yes, sir.

5          MS. ANDERSON:  Your Honor, I would ask that we be

6    able to read from the record, since it's the most accurate --

7          THE COURT:  You can.  You can.  It's just -- let's

8    just make clear for the record when we're reading from the

9    transcript as opposed to just a summary.

10         MS. ANDERSON:  Okay.

11         THE COURT:  Okay.

12         MS. ANDERSON:  Will do.

13   BY MS. ANDERSON:

14   Q.  All right.  The next -- the next entry that I'd like to

15   discuss, and you've gone into this a little bit, the bottom of

16   page seven you've talked about what an 80 is.

17   A.  Yes, ma'am.

18   Q.  And the CHS asks the defendant, "Was this an 80?"  And

19   what did the defendant respond?

20   A.  Reading from the transcript, Mr. Pratchard said, "This is

21   an 80.  I built that as a nine millimeter.  It uses an Uzi

22   clip."

23   Q.  And you explained to us before what an 80 is; correct?

24   A.  Yes, ma'am.

25   Q.  So if I understand correctly, I don't know much about

1    guns, but you can buy a hunk of metal which is referred to as

2    an 80, and then from there, that 80 serves as a base, and then

3    from there you can add components which actually make it a

4    firearm?

5    A.    Yes, ma'am.  The main two parts of a firearm are the

6    upper receiver and the lower receiver.  This -- when he's

7    talking about an 80, he's talking about the lower receiver.

8    Q.    Next let's focus on page nine.  Under the paragraph

9    7:16 a.m., the CHS asks, quote, "Did you build this one, or is

10   this one that you kind of," and what does Mr. Pratchard

11   respond?

12   A.    Reading -- again, reading directly from the transcript,

13   "Yep, built this one too from scratch," and then continues,

14   "Could use oil.  As you build -- as you build they get -- they

15   just get addicting, and you can't stop.  Can't stop, won't

16   stop, man."

17   Q.    Okay.  Further down on that same page, which is page

18   nine, the defendant is talking about muzzle velocity; correct?

19   A.    Correct.

20   Q.    Could you explain to us what he's referring to.

21         Or why don't you read it first and then explain to us

22   what he's referring to.

23   A.    Yes, ma'am.  Again, I'm reading directly from the

24   transcript.  Mr. Pratchard stated -- well, just to give

25   context to the conversation, the CHS is talking -- they're

1    talking about ammunition, and Mr. Pratchard says, "No, it

2    does, but the muzzle velocity on this is about 2600 feet per

3    second, and in order to get it subsonic, you have to get it

4    down below 1200.  So when you" -- "when you" -- I think that's

5    another typo -- "So when you do that, you fucking completely

6    take away its range.  I mean, you knock it down by two-thirds.

7         "So it's almost not even worth it to make a subsonic 7.62

8    millimeter ammunition where this is almost fucking impossible.

9    It's 33 or 3400 feet per second, and the sound barrier is

10   1200.  So you have to get it below the sound barrier.

11   Otherwise, even if you shoot it through the can, as soon as it

12   exits the can, it breaks the sounds barrier, and you hear the

13   crack."

14        What Mr. Pratchard's talking about is he understands the

15   science behind how to make subsonic ammunition.  He

16   understands that he has to lessen the amount of gunpowder in

17   the cartridge so when it is fired, that it won't break the

18   sound barrier and will have a lower auditory signature for

19   anybody around to -- that may or may not hear it.

20   Q.   What's the significance of that?

21   A.   Special operations teams use this -- use this type of

22   ammunition overseas sometimes regarding -- it's a way to limit

23   the ability of anyone around you to hear you.  It's not going

24   to completely silence it, of course, but it will diminish --

25   it won't break the sound barrier.  The round, when it exits

1   the muzzle, will not break the sound barrier and will,

2   thereby, have a lower auditory signature.

3   Q.   Let's look at the bottom of page ten.  There is another

4   conversation about the fact that he, Mr. Pratchard, grabbed

5   the wrong rifle before he came out to Arizona.

6        Is that correct?

7   A.   Yes, ma'am.

8   Q.   Now, prior to that, the defendant had been talking to the

9   source about selling the source a firearm; is that right?

10  A.   Correct.

11  Q.   And does this entry here refer to that?

12  A.   Yes.  Basically the CHS and the -- and the defendant had

13  agreed -- the CHS had agreed to purchase a firearm from the

14  defendant.  However, when the defendant came out here in

15  April, he claimed to have brought the wrong weapon, which he's

16  referring to here.

17       Reading again from the document, "I accidentally grabbed

18  the AR nine millimeter thinking it was your .300 Blackout."

19  They had originally agreed to purchase -- the CHS had agreed

20  to purchase, the defendant agreed to sell, a .300 Blackout

21  rifle, just a different type of rifle, to the -- to the CHS.

22       And here he's talking about the -- the internal workings

23  of the weapon, saying it's -- the catch system -- an SR-25 is

24  a sniper rifle, and Mr. Pratchard's talking about how he

25  builds the -- he built that weapon from scratch.

1   Q.   Now, looking on to page 11, he's talking about milling

2   out the layers.

3        Do you see that?

4   A.   I do.

5   Q.   Okay.  And Mr. Pratchard stated, well, going back to page

6   10, an individual by the name of Dan King questions him.

7   "How?  You build them from scratch?"  And what did

8   Mr. Pratchard answer on page -- on the top of page one?

9   A.   Yes, ma'am.  Pratchard responds in the

10  affirmative, "Uh-huh, and mill out the layers."

11  Q.   And then did Mr. Pratchard go on to talk about the

12  equipment and how he builds these items, these firearms, in

13  his home?

14  A.   He does.  He specifically states, again, reading from the

15  document, "I have a jig at home that allows me to mill it out

16  with a router.  You put a mill, any mill bit on the

17  router, set the jig in there, and you just put it in a vice

18  and work it back and forth."

19       So what he's describing is manufacturing a firearm.

20  Q.   What is this -- what is this milling process?  Could you

21  explain that to us.

22  A.   He's basically working out the components of the firearm

23  to make it a -- to turn a piece of metal into a functioning

24  firearm.

25  Q.   That demonstrates a level of knowledge and

1   sophistication; is that correct?

2   A.   It does.

3   Q.   Let's look at the next entry on page 11 where they're

4   talking about what the range is of a certain -- of a certain

5   firearm.

6        Is that correct?

7   A.   That's correct.

8   Q.   What are they talking about?  Is that -- could you

9   explain that?

10  A.   Mr. Pratchard and the CHS and Mr. King are talking about

11  -- they're asking him, Mr. Pratchard, what the range of the

12  .300 Blackout is, because .300 Blackout ammo doesn't have the

13  same range as 5.5 -- as a standard rifle with standard

14  ammunition.  It's used for more -- more close range -- more

15  close range target shooting or otherwise.  It's more of a

16  close range.  It's not for long range.  And he's saying

17  that -- he's saying the range on the .300 Blackout is 150 to

18  200 yards.

19       He goes on to talk about how it has a 10-and-a-half-inch

20  barrel, and one in seven twist or one in eight is talking

21  about how many times the bullet, when it -- after it's fired

22  and traveling down the barrel, how many times it's going to

23  twist, how many times it's going to spin in the barrel.  The

24  spinning of the round through the barrel is what gives it its

25  accuracy.

1    And he's also talking about a 10-and-a-half-inch barrel.

2    A 10-and-a-half-inch barrel, any firearm, according to -- the

3    National Firearms Act of 1934 states that any rifle that is

4    under 26 inches in length or has a barrel under 16 inches is

5    considered a short-barreled rifle, otherwise known as an SBR.

6    Q.   On the next segment down, the defendant is explaining how

7    he marks all of his -- he describes, "How I mark all of my

8    stuff."

9        Is that correct?

10   A.   That's correct.

11   Q.   And tell us what he's -- what he's describing here.

12   A.   He's talking about how he -- the company that he or the

13   name that he places on some of his firearms is SD Tactical,

14   and he didn't realize that there is an actual SD Tactical in

15   Arizona, so he put "Pacific Beach."  He put "SD Tactical

16   Pacific Beach" on his firearms to differentiate that from the

17   SD Tactical in Arizona.

18   Q.   Now let's go to page 14 of the same transcript.  He's

19   talking about the short-barrel rifles or SBRs; correct?

20   A.   That's correct.

21   Q.   And could you tell us what -- what he's talking about

22   here in this bottom paragraph.

23   A.   If it's all right with you, ma'am, I'll read the

24   transcript and then -- and then just discuss.

25   Q.   That's fine.

1   A.   Mr. Pratchard says, "That's the other thing that scared

2   me.  I thought that.  I didn't -- I didn't realize that.  I

3   thought that SBRs," short-barrel rifles, "were just a

4   California thing.  I didn't know it was nationwide.  You're

5   not allowed to carry SBRs.

6        "So when I came out here for the fucking AZBR op, I had

7   that collapsible stock on that.  I mean, the thing was only

8   about that long on the .300 Blackout.  If any of the border

9   patrol guys had saw me with that thing and happened to just

10  fucking ask a question" -- so he's referencing that if an

11  actual law enforcement agent came into contact with him while

12  he was holding an illegal firearm, that --

13  Q.   It wouldn't be good for him?

14  A.   That's the -- that's what it seems to imply in the --

15  Q.   He's acknowledging that, from what it appears; correct?

16  A.   Yes, ma'am.

17  Q.   Okay.  Let's look at page 17, about a third of the way

18  down.  He's talking about purchasing mags; is that right?

19  A.   He is.

20  Q.   And could you read to us what he's saying and then

21  explain to us what it means.

22  A.   Mr. Pratchard's talking about the nine millimeter SBR

23  that he brought out, that he eventually sold to the CHS, that

24  he was talking about, like, the markings on it.  "I

25  thought" -- he said, "I thought you didn't want markings."

1        So what is in particular important about this paragraph

2   is that Mr. Pratchard says, "Well, it's not registered,"

3   referring to the firearm, "and the numbers are just arbitrary.

4   In fact, I think it's Melissa's birthday."

5        The serial number on the nine millimeter SBR is SD071082,

6   so he's referring to that he used his wife's birthday as the

7   serial number for the SBR.

8   Q.   On page 18, he's talking about a short-barrel rifle; is

9   that correct?

10  A.   He is.

11  Q.   And in the middle of the page, under 7:45 a.m., can you

12  read to us what he says.

13  A.   Yes, ma'am.  Again, reading from the transcript,

14  Mr. Pratchard says, "Mainly I put that," referring to the

15  foregrip on the weapon, "on there because the barrel was so

16  short."

17       Mr. Pratchard then goes on to say, "You should see the

18  nine millimeter I built my brother.  It's dope.  It's a seven-

19  inch barrel.  This is a 10-and-a-half."

20  Q.   Let's go to page 24 of the transcript, under 11:43 a.m.

21  And once again they're talking about an 80 percent; correct?

22  A.   They are.

23  Q.   Which you already described for us.

24       And Mr. Pratchard seems to -- he understands the

25  significance of milling out the parts?

1    A.   He does.

2    Q.   Can you explain that to us.

3    A.   Well, Mr. Pratchard understands that an 80 percent that

4    can be purchased, that, as stated before, is simply a hunk of

5    metal.  Once you mill it, once you put -- once you drill the

6    holes in it, then that is legally a firearm, and he's showing

7    in this that he understands that, obviously saying:

8         CHS, "And 80 percent is not considered a firearm?"

9         Mr. Pratchard, "It is once you mill it."

10   Q.   Let's look at page 28, the very top section.

11        Now, this is during the discussion that the source and

12   the defendant had about selling -- Mr. Pratchard selling the

13   firearm --

14   A.   Correct.

15   Q.   -- to the source; correct?

16   A.   Correct.

17   Q.   Okay.  And Mr. Pratchard wanted to wait and sell the

18   firearm at the end of his visit when he was leaving.

19        Is that correct?

20   A.   That's correct.

21   Q.   In the very last portion of the -- of the segment, what

22   does Mr. Pratchard say?

23   A.   Mr. Pratchard says -- the CHS is referring to the people

24   that he stays with aren't going to care that there is another

25   weapon in the house, and Mr. Pratchard says, again, reading

1  from the transcript, "I ain't worried about them.  I'm worried

2  about your fucking -- all your sheriffs and fucking federal

3  law enforcement friends."

4  Q.   Let's turn to page 31, under the segment labeled

5  8:10 a.m.

6  A.   Yes, ma'am.

7  Q.   And they're talking about coordinates, terrain locations,

8  and where they plan on going; is that correct?

9  A.   That's correct.  They were going to conduct a border

10  operation, essentially, between the CHS and the -- and

11  Mr. Pratchard.

12  Q.   Okay.  And they talk about where they're going to go, and

13  what does -- what does Mr. Pratchard say about running into

14  rip crews?

15  A.   Mr. Pratchard, reading from the document, says, "Does

16  this mean we get to engage rip crews?"

17      And rip crews are essentially people in the desert that

18  steal firearms -- that steal drugs or cash loads from

19  suspected undocumented immigrants coming across the border.

20  Q.   And looking at page 32, at the very top, the CHS responds

21  with what?

22  A.   CHS responds, reading from the document, "More than

23  likely.  Not looking forward to it."

24  Q.   And what does the defendant respond?

25  A.   The defendant responds, "I am."

RYAN McGEE -- DIRECT EXAMINATION                    38

1   Q.   Continuing down to 8:11 a.m., what does the CHS say?

2   A.   CHS states, "Yeah, you think that.  Shit gets real real

3   quick."

4   Q.   And what does the defendant respond?

5   A.   Mr. Pratchard responds, again, reading from the

6   document, "I'm looking forward to it.  I want to do it.  I

7   want to do it."

8   Q.   Referring to engaging with a rip crew?

9   A.   Correct.

10  Q.   All right.  Let's look at the video recording, and this

11  is a transcript from the video recording, and the dates for

12  this are April 26th through April 28th of this year; is that

13  correct?

14  A.   That is correct.

15  Q.   And let's look at page three of that transcript.  And the

16  segment I'm referring you to is after 17:22 p.m.

17  A.   Yes, ma'am.  I see it.

18  Q.   Okay.  And the defendant -- the defendant is talking

19  about the number of rifles that he -- that he could make;

20  correct?

21  A.   Yes, ma'am.

22  Q.   What does he say?

23  A.   Mr. Pratchard asked the CHS, "Do you know how many

24  Blackout rifles you could buy if you stop smoking?"

25       And the CHS responds, "As many as you can make."

1        And Mr. Pratchard responds, "Exactly."

2   Q.   Now, the final transcript, the final segment I'm going to

3   call your attention to, is on page five.

4   A.   Yes, ma'am.

5   Q.   And it's at 8:15 a.m., and the defendant is talking to

6   his dog; is that correct?

7   A.   That's correct.

8   Q.   And so I take it this was in San Diego?

9   A.   Yes, ma'am, it was.

10  Q.   And what did the defendant say?

11  A.   The defendant was speaking to his dog, and he

12  specifically says, reading from the document, "Who's that?  Go

13  get him.  Go get him.  Go get that Mexican."

14        MS. ANDERSON:  Government moves to admit Exhibit No.

15  29, which is the transcripts.

16        MR. MARBLE:  Clarification, Your Honor.

17        THE COURT:  Yes.

18        MR. MARBLE:  May I ask -- may I voir dire the

19  witness?

20        THE COURT:  Sure.

21                      VOIR DIRE EXAMINATION

22  BY MR. MARBLE:

23  Q.   Agent McGee, is this transcript complete, or is it

24  segments of the audio and video?

25  A.   This is the -- this is the entire transcript, sir.  The

1  audio and video are -- it's difficult to determine when they

2  shut off and when they don't.  The CHS can turn a recorder on

3  and turn a recorder off, but in between that time, for an

4  unknown reason, sometimes it cuts out, and then it'll start

5  again.

6      So what we transcribe is all of the data that we received

7  from that.

8  Q.  So this -- these conversations may be incomplete, but

9  what's transcribed is everything that was recorded?

10  A.  That's correct, sir.

11      MR. MARBLE:  Okay.  No objection.

12      THE COURT:  Okay.  So that is, what, 29?

13      MS. ANDERSON:  29.

14               FURTHER DIRECT EXAMINATION

15  BY MS. ANDERSON:

16  Q.  Let's take a look at Government's Exhibit No. 7.  Do you

17  recognize what's shown in the photo?

18  A.  Yes, ma'am, I do.

19  Q.  And what is that?

20  A.  This is nine millimeter SBR that the defendant sold to

21  the CHS on April 14th of this year.

22  Q.  Now, you say SBR.  That's a short-barrel rifle?

23  A.  Yes, ma'am, it is.

24  Q.  And did you measure or --

25  A.  Yes, ma'am, we measured it.

1   Q.   And what was the length?

2   A.   The length of the barrel was approximately 10-and-a-half

3   inches.

4   Q.   And this was sold to the CHS for $3,000; is that correct?

5   A.   That's correct.

6          MS. ANDERSON:  Government moves for admission of

7   Exhibit 7.

8          MR. MARBLE:  No objection.

9          THE COURT:  7's admitted.

10  BY MS. ANDERSON:

11  Q.   Let's take a look at Government's Exhibit No. 28.

12       We had talked previously that the CHS traveled to San

13  Diego between April 26th and April 28th of this year to visit

14  the defendant; is that correct?

15  A.   Yes, ma'am, that's correct.

16  Q.   And during that time, he stayed at his home; is that

17  right?

18  A.   That's correct, ma'am.

19  Q.   And at some point in time the defendant showed the source

20  the closet where he manufactures all these firearms and

21  ammunition; is that correct?

22  A.   Yes, ma'am, he did.

23  Q.   And so let's talk about it.  Are these the photos that

24  were taken from the -- from the defendant's closet in San

25  Diego?

RYAN McGEE -- DIRECT EXAMINATION                42

1  A.   Yes, ma'am, they are.

2  Q.   Let's talk about the photos one by one.

3  A.   Yes, ma'am.  The first photo shows a press for making

4  ammunition.  The gray substance in the tube at the top of

5  this, that's gun powder, smokeless gunpowder, and this is what

6  Mr. Pratchard is believed to have used when he was creating --

7  when he makes ammo, this is the machine that he uses.

8       You can also see in the background there is sets of ear

9  protection, as well as ammo cans on the top shelf delineating

10 which type of ammunition the -- which type of ammunition is

11 stored in each of those containers.

12 Q.   That's the first picture.  What's in the second picture?

13 A.   The second picture appears to be -- there is a can

14 labeled, "Ammo Crate."  There is also additional ammo cans,

15 which this is -- this is a picture from above the press for

16 the ammunition.

17 Q.   And the next photo?

18 A.   The third photo is a more closeup shot of the -- the more

19 centered shot of the ammunition on top of the shelf.  There is

20 also another safe or some sort of storage unit in the bottom

21 right, which has additional ammunition in it.

22 Q.   And finally, the last photo.

23 A.   The last photo is the safe in which Mr. Pratchard keeps

24 his firearms.

25 Q.   In San Diego?

1  A.   That's correct.

2          MS. ANDERSON:  Government moves for admission of

3  Exhibit No. 28, which is the four photos.

4          MR. MARBLE:  No objection.

5          THE COURT:  Okay.  28's admitted.

6  BY MS. ANDERSON:

7  Q.   Now, do we have information that Mr. Pratchard knows the

8  combination to the safe --

9  A.   We do.

10 Q.   -- in San Diego?

11      And what is that?

12 A.   I believe the safe combination is 120107.

13 Q.   And I'm sorry.  We have information that Mr. Pratchard

14 knows that combination; correct?

15 A.   He does.

16 Q.   And how do we know that?

17 A.   Mr. Pratchard communicated that information to his wife

18 while he was in Arizona.

19 Q.   Let's look at Exhibit No. 8.

20 A.   Yes, ma'am.

21 Q.   Are you familiar with what's shown in Exhibit 8?

22 A.   Yes, ma'am, I am.

23 Q.   What is it?

24 A.   This is a short-barreled rifle with a silencer and

25 400-plus rounds of ammunition.

RYAN McGEE -- DIRECT EXAMINATION                    44

1    Q.   Okay.  And what's the significance of what's shown here

2    in the photo?

3    A.   Significance of this photo is that neither the short-

4    barreled rifle or the suppressor are serialized.  This is the

5    item -- and this is .300 Blackout ammunition that the

6    defendant produced and sold to -- he sold everything you're

7    seeing in this picture to the CHS for $3,800.

8    Q.   Now, did any of the firearms that Mr. Pratchard sold to

9    the CHS or had in his vehicle at the time of his arrest have

10   serial numbers?

11   A.   One, the initial short-barreled rifle, that was the nine

12   millimeter that was sold on April 14th, was serialized.

13   However, when we -- part of the evidentiary process in the FBI

14   is you have to run an ATF trace on the these -- on these

15   weapons to determine if they're legal or if they're stolen or

16   what have you.  So we submitted this to the ATF, and the

17   result was it came back as invalid, meaning that that weapon

18   was never properly registered.

19        In addition the -- one of the pistols that was -- excuse

20   me.  One of the pistols or the pistol that was found in his

21   vehicle was serialized.  However, we have not gotten the

22   report back from the Bureau of Alcohol, Tobacco, and Firearms

23   as to whether or not that weapon is -- is a legal weapon.  It

24   has the same markings on it, SD Tactical Pacific Beach,

25   California, SD, and then the six digit number on it, but we

1    don't have those yet.

2        The other two rifles that were found in the bed, in the

3    lock box of Mr. Pratchard's vehicle, neither of them are

4    serialized, so we can't run a trace on them -- on them.

5    Q.   Now, Mr. Pratchard was arrested on June 1st of this year;

6    is that correct?

7    A.   He was.

8    Q.   And he was arrested according to an arrest warrant, and

9    we had a search warrant for his vehicle; correct?

10   A.   That's correct.

11   Q.   Where was he arrested?

12   A.   He was arrested at Casino Del Sol.

13   Q.   And approximately what time?

14   A.   Approximately 8:45 in the morning on June 1st.

15   Q.   What vehicle was Mr. Pratchard driving prior to his

16   arrest?

17   A.   Mr. Pratchard was driving a 2018 Ford F150 white

18   four-door.

19   Q.   Mr. Pratchard had come out to Arizona a couple of times

20   prior to his arrest; is that right?

21   A.   That is correct.

22   Q.   Had he driven that vehicle on other occasion when he has

23   traveled to Arizona?

24   A.   When he came out on -- in April, he drove this same

25   truck.

1  Q.   Let's talk about what was found during the course of the

2  search warrant.  Take a look at -- well, before I ask

3  you, before we get into details and talk about each of the

4  items individually, how many -- how many firearms overall were

5  found in the defendant's vehicle when he was arrested and the

6  search warrant was executed?

7  A.   Three firearms were found in his vehicle, one pistol, one

8  short-barreled rifle, and one standard rifle.

9  Q.   And how many live rounds were found in the defendant's

10 vehicle during the search warrant?

11 A.   290.

12 Q.   290 rounds.  And those were different calibers and for

13 different kinds of firearms; is that correct?

14 A.   Yes, ma'am.

15 Q.   Let's look at Government's Exhibit No. -- No. 10, 11, and

16 12.  I'm sorry.  9, 10, 11, and 12.

17       THE COURT:  Did you want to move the admission of

18 Exhibit 8?

19       MS. ANDERSON:  Yes.

20       THE COURT:  Okay.

21       MS. ANDERSON:  Yes.  Thank you, Your Honor.  The

22 Government so moves.

23       THE COURT:  Any objection, Mr. Marble?  This is the

24 photograph of the other firearm and ammunition.

25       MR. MARBLE:  No objection.

1          THE COURT:  Okay.  8's admitted.

2    A.   I see them, ma'am.

3    Q.   Okay.  We're talking about -- well, what's depicted in

4    Exhibit No. 9 and Exhibit No. 10?

5    A.   Exhibit No. 9 and 10 are the vehicle, both the vehicle

6    that Mr. Pratchard drove out to California -- or drove out to

7    Arizona from California.

8    Q.   And that's the vehicle that you described for us; is that

9    correct?

10   A.   Yes, ma'am, that's correct.

11   Q.   And in Government's Exhibit 10, we see an unusual sort of

12   -- it's not a license plate, is it?

13   A.   No, it is not.

14   Q.   It's something other -- in fact, if you looked at

15   Government's Exhibit No. 11, we'll see a license plate and

16   then another plate below it; correct?

17   A.   Yes, ma'am, that's correct.

18   Q.   Where were the -- where was the top one found, the top

19   plate?

20   A.   I believe the top one was found in the vehicle, ma'am.

21          MS. ANDERSON:  Government moves for admission of

22   Exhibits 9, 10, and 11.

23          MR. MARBLE:  No objection.

24          THE COURT:  All right.  9, 10, and 11 are admitted.

25   BY MS. ANDERSON:

1   Q.   Let's look at Exhibits 12 and 13.  What's shown in those

2   exhibits?

3   A.   12 and 13 are -- excuse me.  12 and 13 are the same item.

4   They're two fully loaded .45 caliber magazines, pistol

5   magazines, that were found in the rear right quadrant of

6   Mr. Pratchard's vehicle.

7   Q.   The pickup truck that he was driving; correct?

8   A.   Yes, ma'am.

9            MS. ANDERSON:  Government moves for admission of

10  Exhibits 12 and 13.

11           THE COURT:  Any objection, Mr. Marble?

12           MR. MARBLE:  No objection.

13           THE COURT:  12 and 13 are admitted.

14  BY MS. ANDERSON:

15  Q.   Let's look at Exhibits 14, 15, 16, and 17, since they are

16  all related.

17       First of all, could you tell us, what's Government's

18  Exhibit No. 14?  What's shown there?

19  A.   Government's Exhibit 14 is a .45 caliber pistol in a

20  tactical drop holster.

21  Q.   Okay.  And what's shown in 15, 16, and 17?

22  A.   15, 16, and 17 are all of the -- this is the pistol that

23  was within the drop holster that was found in the -- the lock

24  box of Mr. Pratchard's vehicle.

25           MS. ANDERSON:  Government moves for admission of

1    Exhibits 14 through 17.

2                THE COURT:  Any objection?

3                MR. MARBLE:  No objection.

4                THE COURT:  All right.  14 through 17 are admitted.

5    BY MS. ANDERSON:

6    Q.   Looking at the -- at the inscription, the "SD Tactical

7    Pacific Beach, California," have you found a business called

8    SD Tactical?

9    A.   There is an SD Tactical, but the only one we found was in

10   Arizona.

11   Q.   It's not Pacific Beach?

12   A.   No, ma'am.

13   Q.   Does this appear to be something that Mr. Pratchard would

14   have placed on the firearm himself?

15               MR. MARBLE:  Objection.  Calls for speculation, Your

16   Honor.

17               THE COURT:  Yeah, sustained.

18               Are we looking at Exhibit 16?

19               MS. ANDERSON:  We are.

20               THE COURT:  Okay.

21               MS. ANDERSON:  I'll withdraw that question.

22   BY MS. ANDERSON:

23   Q.   Let's look at 18 and 19.  What's depicted there in 18?

24   A.   This is a vest.  It's a plate carrier found in

25   Mr. Pratchard's vehicle.

1    Q.   And what was contained in Government's Exhibit 17?  Was

2    that the --

3    A.   Government -- Exhibit 17 is the drop holster in which the

4    pistol, the .45 caliber pistol, was found.  The magazine and

5    loose round are due to the fact that when the -- per FBI

6    procedure in clearing firearms, the way you -- the way you

7    clear a firearm is obviously you point in a safe direction

8    first, in which case you eject the magazine.

9         The magazine contained nine rounds.  You then remove --

10   pull the slide back, and the -- if a round is chambered,

11   meaning it's in the barrel, ready to fire, then that round

12   will pop out.

13        So that means that this handgun was loaded and chambered

14   when it was found.

15           MS. ANDERSON:  Government moves for Exhibit 17, if I

16   haven't done so already.

17           THE COURT:  Yeah, that's already in.

18           MS. ANDERSON:  Okay.

19   BY MS. ANDERSON:

20   Q.   Let's look at Exhibits 18 and 19.  First of all, could

21   you describe for us what's shown in Exhibit 18.

22   A.   Exhibit 18 is a tactical vest.  It's a plate carrier that

23   is able to contain -- able to hold various ammunition and

24   other -- it's designed to hold ammunition and other things you

25   would usually use in a tactical environment.

1    Q.   What's shown in Exhibit 19?

2    A.   Exhibit 19 shows all the items that were within the

3    tactical vest that was found in Mr. Pratchard's vehicle.

4    There are two fully loaded .45 caliber pistol magazines, as

5    well as three -- three rifle magazines, a GPS and a

6    tourniquet, as well as bullet-resistant plates that are

7    inserted into the vest.

8    Q.   You said bullet-resistant plates?

9    A.   Yes, ma'am.

10           MS. ANDERSON:   Government moves for admission of

11   Exhibits 18 and 19.

12           MR. MARBLE:   No objection.

13           THE COURT:   18 and 19 are admitted.

14   BY MS. ANDERSON:

15   Q.   Let's take a look at Government's Exhibits 20 through 26.

16        Starting with Government's Exhibit No. 20, are you

17   familiar with what's shown here in the photograph?

18   A.   Yes, ma'am.

19   Q.   Could you describe that for us.

20   A.   This is the lock box in which all three of the weapons

21   that were found in Mr. Pratchard's vehicle were found.  It was

22   locked when we -- when we executed the search warrant on the

23   vehicle.

24   Q.   And did the defendant have the keys in his possession?

25   A.   He did.

RYAN McGEE -- DIRECT EXAMINATION                52

1    Q.   And you were able to unlock the box?

2    A.   We were.

3    Q.   Looking at Government's Exhibit No. 21, could you explain

4    to us what that is.

5    A.   Number 21 is the soft rifle case that was contained in

6    the lock box in Mr. Pratchard's vehicle.

7    Q.   Were there any firearms in that soft case?

8    A.   Yes, ma'am, there were.  There were two firearms.

9    Q.   Look at Government's Exhibit No. -- well, 21, we're able

10   to see one firearm in there; correct?

11   A.   That's correct.

12   Q.   And Exhibit No. 22, we're able to see a second firearm in

13   there; is that correct?

14   A.   Yes, ma'am, that's correct.

15         MS. ANDERSON:  Government moves for admission of

16   Exhibits 20, 21, and 22.

17         MR. MARBLE:  No objection.

18         THE COURT:  Those are admitted.

19   BY MS. ANDERSON:

20   Q.   Let's look at Government's Exhibits 23 through 26.

21        Could you explain to us what Government's Exhibit 23

22   shows.

23   A.   Exhibit 23 is one of the two rifles removed from

24   Mr. Pratchard's vehicle.

25   Q.   What kind of rifle was this?

1   A.    This is a -- this is a standard -- a standard rifle.

2   It's not a short-barreled rifle, due to the fact that the

3   barrel is beyond 16 inches in length.  However, it is

4   unserialized.

5   Q.    Next is Government's Exhibit No. 24.  Take a look at

6   that.

7         What's shown there?

8   A.    This is the other rifle taken from Mr. Pratchard's

9   vehicle.

10  Q.    And could you describe that for us.

11  A.    This is a short-barreled rifle, due to the fact that

12  barrel length is under -- excuse me -- is under 16 inches.  It

13  has a suppressor, as well as an ACOG, which stands for

14  advanced combat optical gunsight, and a collapsible --

15  collapsible stock.  It is also unserialized.

16  Q.    Now, you said it has a suppressor.  Is that also referred

17  to as a silencer?

18  A.    Yes, ma'am.  They're synonymous.

19  Q.    Could you explain to us what a silencer is.

20  A.    A silencer is a -- it's an accessory to a firearm that is

21  placed on the end of a barrel, and what it does is it -- it

22  has baffling inside of it so it reduces the auditory signature

23  of a round when it comes out of the -- when it comes out of

24  the barrel.

25  Q.    Are those prohibited?

1  A.    They are -- there are very strict rules that govern the

2  use of firearms.  Currently 42 states you're legally allowed

3  to own -- you're legally allowed to own suppressors.

4  California is not one of those states.  Arizona is.

5  Q.    Are they regulated by ATF?

6  A.    Yes, they are.  They're also supposed to be serialized.

7  This one is not.

8  Q.    Let's take a look at Government's Exhibit No. 25.

9  A.    Yes, ma'am.

10  Q.    Could you describe what you see in that photo.

11  A.    This is the same -- the same rifle, just a different

12  picture of it.

13  Q.    Okay.  And finally Exhibit 26.

14  A.    Exhibit 26 is a close-up of the exhibit, Exhibit 25.  It

15  just shows that this rifle is chambered for .300 Blackout

16  ammunition.

17          MS. ANDERSON:  Government moves for admission of

18  Exhibit 23 through 26.

19          MR. MARBLE:  No objection.

20          THE COURT:  Are Exhibits 23 through 26 the two

21  rifles that were in that soft case?

22          THE WITNESS:  Yes, sir.

23          THE COURT:  Okay.  Thank you.

24          Okay.  So 23 through 26 are admitted.

25  BY MS. ANDERSON:

1   Q.   Let's look at Government's Exhibit No. 27.

2        Do you recognize what's shown here?

3   A.   Yes, ma'am.

4   Q.   What is that?

5   A.   This is the case that these rifles were found in.

6   Q.   And we also see some magazines up above; is that right?

7   A.   That's correct, ma'am.

8   Q.   How many magazines?

9   A.   There are six magazines in this picture.

10  Q.   And were they fully loaded?

11  A.   The -- I don't remember the exact round count, but at

12  least -- they had a large quantity of ammunition in these.

13           MS. ANDERSON:   Government moves for admission of

14  Exhibit 27.

15           MR. MARBLE:   No objection.

16           THE COURT:   27's admitted.

17  BY MS. ANDERSON:

18  Q.   So at the same time that the defendant was arrested here

19  in Arizona, there was a search warrant that was conducted at

20  the defendant's home in San Diego; is that correct?

21  A.   That's correct.

22  Q.   And that was done with the assistance of federal law

23  enforcement in San Diego?

24  A.   That's correct.

25  Q.   And again, once again, a search warrant was obtained by a

1    magistrate in San Diego; is that right?

2    A.   Yes, ma'am.

3    Q.   Now, let's talk about some of the things that were found

4    in the defendant's home when the search warrant was executed

5    on June 1st.

6         Do you know how many firearms were seized from the

7    defendant's home on June 1st?

8    A.   Eight firearms were seized on June 1st.

9    Q.   Do you know how much ammunition was seized from the

10   defendant's home?

11   A.   No, ma'am.  I don't have an exact count of the amount of

12   ammunition, but according to -- speaking to the people who

13   executed the search warrant, there is a large quantity of

14   ammunition.

15   Q.   Take a look at Government's Exhibit No. 30.  Do you

16   recognize that?

17   A.   Yes, ma'am.

18   Q.   And what do you recognize this as being?

19   A.   This is an evidence recovery log of all the things seized

20   from the San Diego apartment.

21             MS. ANDERSON:  Government moves for admission of

22   Exhibit 30.

23             THE COURT:  Any objection?

24             MR. MARBLE:  No objection.

25             THE COURT:  30 is admitted.

1          MS. ANDERSON:  Judge, may I have just a moment to

2    check my notes?

3          THE COURT:  Sure.

4          MS. ANDERSON:  Let me just check my notes, Your

5    Honor.

6          THE COURT:  Sure.

7          MS. ANDERSON:  I believe I'm done.

8          THE WITNESS:  Ma'am, would you like me to speak

9    about any specific items in the --

10          MR. MARBLE:  Objection, Your Honor.  I don't think

11    the witness --

12          THE COURT:  Ms. Anderson will ask you if she has any

13    questions.

14          THE WITNESS:  Roger that.  Yes, sir.

15    BY MS. ANDERSON:

16    Q.   Turning to Government's Exhibit No. 30, again, this is

17    the property, the evidence recovery log from the San Diego

18    search warrant; correct?

19    A.   It is.

20    Q.   Is there anything noteworthy regarding the items that

21    were seized?

22    A.   There's two -- there is a few items of note.  Outside of

23    the eight firearms that were seized, there were six containers

24    of black -- black powder, which is what would be used to

25    reload ammunition.  There is also a press, a reloading

1   press, Item 19.  There is also jig parts.

2       There is essentially, what he stated, there's --

3   everything you would need to create a firearm is in -- or the

4   vast majority of it is located in this apartment and was

5   seized.

6   Q.   In fact, at one point the defendant told the CHS that his

7   equipment is similar to that of an armorer; correct?

8   A.   Yes, that's correct.

9   Q.   And based on the photos that we saw from the CS's trip to

10  San Diego and what was seen described here, that appears to be

11  true; correct?

12  A.   That's correct.

13          MS. ANDERSON:  That's all I have, Judge.

14          THE COURT:  Okay.  So let's take our lunch recess.

15  We'll come back at 3:15.  We'll be in this courtroom.  I was

16  wrong when I advised you guys it would be the courtroom after

17  initial appearances.  It's just easier to come back here at

18  3:15.

19          If you -- I'm hoping to be done with initial

20  appearances by 3:15 if you all want to come a little earlier

21  in the event I am.  If I'm not done by 3:15, you'll have to

22  wait a bit, but it kind of depends on the length of that

23  calendar.  So we'll come back at 3:15, give or take, and

24  Mr. Marble, you'll do your cross-examination.

25          Okay?  All right.  Thank you, everybody.  Thank

1    you, Agent.

2            (Off the record from 11:59 a.m. to 3:31 p.m.)

3            THE CLERK:  Back on the record in 18-MJ-3091, United

4    States of America vs. Joshua Joel Pratchard, on for detention

5    hearing.

6            Counsel, please restate your appearances.

7            MS. ANDERSON:  Beverly Anderson for the United

8    States.  Good afternoon.

9            THE COURT:  Good afternoon.

10           MR. MARBLE:  Good afternoon, Your Honor.  Jay Marble

11   for Joshua Pratchard.  He's present, in custody.

12           THE COURT:  Okay.  Good afternoon to you both.

13           So Agent McGee, do you want to come back up to the

14   stand?

15           And then, Mr. Marble, you can do your cross-

16   examination.

17                       CROSS-EXAMINATION

18   BY MR. MARBLE:

19   Q.   Good afternoon.

20   A.   Good afternoon, sir.

21   Q.   I'm going to try and maybe go backwards or in the same

22   reverse order as direct, so I'm going to ask you first about

23   the Arizona Border Recon.

24   A.   Okay.

25   Q.   So you told us on direct examination that you've studied

RYAN McGEE -- CROSS-EXAMINATION                60

1   in general militia border groups?

2   A.   I have.

3   Q.   And in particular, you've studied the Arizona Border

4   Recon group?

5   A.   I know -- I'm familiar with them.  I don't -- I don't

6   know the inner workings of them, but yes.

7   Q.   You know Tim Foley is the supervisor of that group?

8   A.   I do, yes.

9   Q.   And it sounds like you have some people who have

10  infiltrated that group as well?

11  A.   We have sources that have reported on that group.

12  Q.   And you're aware that to be -- to participate with

13  Arizona Border Recon, that you have an application process?

14  A.   Usually, yes, sir.

15  Q.   And Joshua Pritchard, Pratchard, excuse me, filled out an

16  application that was accepted by them?

17  A.   I'm not sure.  I haven't spoken to Mr. Foley about that

18  particular application.

19  Q.   It's unlikely that he would have been invited there if he

20  hadn't passed their checks.  Wouldn't you agree with that?

21  A.   I would, yes.

22  Q.   And they are heavily armed; correct?

23  A.   When you say "checks," what are you referring to, sir?

24  Q.   Their application process.

25  A.   Okay.  Yes, sir.

RYAN McGEE -- CROSS-EXAMINATION                    61

1   Q.   And are you aware if they actually run a background check

2   on individuals?

3   A.   No, I'm not.

4   Q.   Okay.  So it's possible that actually the Arizona Border

5   Recon ran a background check on Joshua Pratchard?

6   A.   It's possible, yes, sir.

7   Q.   And they might be inclined to do that since most of the

8   people who are there, are there on the missions, are armed?

9   A.   (No verbal response.)

10  Q.   I can ask it a different way.

11  A.   Okay.  Yes, sir.

12  Q.   So they wouldn't want publicity getting out that they are

13  having people participate in their activities who aren't

14  supposed to possess weapons.  Wouldn't you agree that would be

15  bad press?

16  A.   Yes, I would, sir.

17  Q.   So in your -- would you agree that they'd probably screen

18  out -- screen out people who they don't want to participate?

19          MS. ANDERSON:  Objection.  Foundation.

20          THE COURT:  Well, I guess if you know.

21  A.   Could you repeat the question, sir?

22  Q.   Sure.  They'd want to screen out people who don't pass

23  their -- who they don't want to participate in their

24  activities?

25  A.   Yes, sir.

1   Q.   Because they don't want just anybody going down there and

2   participating?

3            MS. ANDERSON:   Objection.   Foundation.

4            THE COURT:   Well, if he has information -- if you're

5   speculating, don't speculate.

6            THE WITNESS:   Okay.   Yes, sir.

7            THE COURT:   If you know, then testify to it.

8   A.   I'm not familiar with the exact application process of

9   Arizona Border Recon.

10  Q.   But -- but just to backtrack, Mr. Pratchard passed their

11  check and participated in activity in January with them?

12  A.   I don't know if there was any kind of legal check done on

13  Mr. Pratchard.   I know that he participated in an event.   I

14  just can't verify whether or not any background checks were

15  run on Mr. Pratchard prior to his involvement.

16  Q.   So I understand that, but he passed their application

17  process to participate.   Would you agree with that?

18           MS. ANDERSON:   Objection.   Lack of foundation.

19  Speculation.   I believe the witness has already answered he

20  doesn't know if he did or if he did not.

21           THE COURT:   I think he did.   I think he

22  has, Mr. Marble.

23           MR. MARBLE:   I'll move on.

24           THE COURT:   I don't think he knows.

25  BY MR. MARBLE:

1   Q.   So moving on to the court-martial, would you agree with

2   me that military courts don't use the terms "felonies" or

3   "misdemeanors?"

4   A.   I'm not sure.  I've never been subject or involved in a

5   court-martial.

6   Q.   You -- on direct examination you termed his conviction

7   from the court-martial as a felony.

8   A.   I did based on we have a task force officer who is an

9   NCIS agent who told me that a conviction in general court-

10  martial is the equivalent of a felony.

11  Q.   Okay.  But -- but for our purposes, under the military

12  code, they're not termed "misdemeanors" or "felonies."

13  A.   I would assume not.  I don't know.

14  Q.   So that was just information that was provided to you and

15  unverified?

16  A.   It was verified through an NCIS agent, so I took him at

17  his word regarding the equivalency matter.

18  Q.   But you did not investigate the military code?

19  A.   Not to the -- not specifically to felonies and

20  misdemeanors and their equivalent, no.

21  Q.   And you're also aware, or are you aware, that the

22  military branch must -- the particular military branch

23  involved in the court-martial must report that conviction to

24  law enforcement?

25  A.   I didn't know that, but I assume that's accurate.

RYAN McGEE -- CROSS-EXAMINATION                          64

 1   Q.   And are you aware that that's not always done?

 2   A.   Yes.

 3   Q.   Are you also aware that, when Mr. Pratchard was on -- was

 4   on -- serving his term of the sentence, he was paroled off

 5   early because of the work that he did through the military?

 6   A.   I am.

 7   Q.   And that was because -- are you aware that that's because

 8   he went around to other groups of military members and told

 9   them about the mistakes he'd made when he was -- the cause of

10   this court-martial?

11   A.   No, sir, I'm not aware of that.  I know that he was

12   released early, but I don't know.  I didn't know the specifics

13   as to why.

14   Q.   And are you aware that it's unusual for people to be

15   released early off their sentence?

16   A.   I am not.  No, sir.

17   Q.   I'd like to ask you some questions now about the Presidio

18   incident in San Francisco.  You mentioned you believe that

19   occurred at an Oktoberfest festival?

20   A.   Yes.

21   Q.   And are you aware that Mr. Pratchard was defending a

22   friend of his?

23   A.   No, I was not.

24   Q.   And there was -- it was actually a pretty large fight.

25   It wasn't just an isolated incident.

1    A.    I was not aware of that.

2    Q.    Are you also aware -- have you seen -- have you

3    personally seen the video that was referred -- that you

4    referred to earlier regarding that incident?

5    A.    No.

6    Q.    So you were just making a reference on somebody else's

7    comment on the video?

8    A.    From the police report.  My knowledge of the incident is

9    directly from the police report.

10   Q.    Very well.  And in that case, you describe the injuries

11   and also the pictures of the victim; correct?

12   A.    Correct.

13   Q.    And you're aware that Mr. Pratchard received a sentence

14   of probation for that offense?

15   A.    Yes.

16   Q.    With -- obviously with some community confinement?

17   A.    Correct.

18   Q.    Now, do you have the exhibits with you up there?

19   A.    I do.

20   Q.    Okay.  I'd like to ask you to refer to Exhibit 5.  I'll

21   ask you the question.  If you're unable to recall, please feel

22   free to let us know.

23        In that domestic violence case in San Diego, you're aware

24   that, when the police officers arrived on scene, Ms. Pritchard

25   (sic), Melissa Pritchard (sic), didn't have any visible marks

1  on her?

2  A.    Again, my knowledge of the incident is strictly from the

3  -- from the report itself, but let me --

4  Q.    Do you recall that, or do you need to refresh your

5  recollection?

6  A.    I have the -- could I just take a minute to look at the

7  report?

8  Q.    Very well.  It's on page -- looks like the fax page is

9  page seven.

10  A.    Fax page.

11          THE COURT:  If you look at the top, there's --

12          MR. MARBLE:  It's on page six of eight of the

13  report.

14          THE WITNESS:  Is it this page with the -- with

15  the --

16          MR. MARBLE:  No.  That is --

17          THE COURT:  It's the narrative page.  It's the

18  narrative you read from.

19          MR. MARBLE:  It's the two pages --

20          THE WITNESS:  Oh, narrative.

21          THE COURT:  Under, "Continued Investigation."

22          THE WITNESS:  Oh, "Continued Investigation."

23  A.    Okay.  Yes, sir.  It says right here, "Melissa did not

24  have any visible injuries."

25  Q.    And that was after she had told the officers that he had

 1  physically grabbed her by the arms and picked her up and moved

 2  her from one place to another; correct?

 3  A.   Based on the report, yes, sir.

 4  Q.   Yes.  And everything in that same paragraph, the next

 5  question, if you need to refresh your recollection, is Joshua

 6  was arrested that night; correct?

 7  A.   Correct.

 8  Q.   And he complied with the officers?

 9  A.   Yes, sir.  He -- yes.

10         MS. ANDERSON:  Objection.  Foundation.

11         THE COURT:  Well --

12         MR. MARBLE:  It says that he was handcuffed without

13  incident, Your Honor, I believe.

14         THE COURT:  Well, he -- we've done a lot of reading

15  from reports, so you can either summarize or read from the

16  report verbatim.  Just let us know which one you're doing.

17         THE WITNESS:  Yes, sir.

18  A.   Reading from the report, "I placed Joshua in handcuffs,"

19  correct.  Yes, sir.

20  Q.   So there is no reference that he was combative or

21  uncooperative with the officers?

22  A.   Correct.

23  Q.   No information that he resisted arrest?

24  A.   No, sir.

25  Q.   And he was the only one arrested?

1    A.    According to the report, yes, sir.

2    Q.    Yes.  And are you aware that, if you know the answer to

3    this, when police officers respond to domestic violence in San

4    Diego, someone has to be arrested, irregardless of what the

5    individuals want?

6    A.    I was not aware of that, but I've heard in some

7    departments that is the policy, yes, sir.

8    Q.    And are you also aware that this incident was later

9    dismissed or released from prosecution two days later?

10   A.    Yes, sir.

11   Q.    Now, I want to ask you about -- I'll probably mix up the

12   terms, but "CHS" to you means confidential human source?

13   A.    Yes, sir.

14   Q.    Okay.  I might interchange it with confidential

15   informant, but I'll try and stick with CHS.

16         So this is somebody that is paid by the Government?

17   A.    He receives payment on the Government based on the

18   information he provides, yes, sir.

19   Q.    And usually paid in cash?

20   A.    Yes, sir.

21   Q.    Was this CHS handled by you?

22   A.    He was.

23   Q.    Okay.

24   A.    He is.

25   Q.    You were his handler?

1   A.    I am.

2   Q.    Why don't you tell us what a handler does.

3   A.    A handler basically instructs a CHS on, if we're looking

4   for a particular type of event or something that's going to

5   happen, we'll essentially task the source in regard to look

6   out for a particular violation or -- essentially directing him

7   as to what I'm asking him to look for or report on.

8   Q.    So in this case, can I assume that the CHS reported back

9   to you after the January Arizona Recon mission?

10  A.    He did.

11  Q.    And he probably reported that there was an individual who

12  caused attention there?

13  A.    He did.

14  Q.    And that was Mr. Pratchard?

15  A.    It was.

16  Q.    And that's when your investigation began?

17  A.    Yes.

18  Q.    And that information is coming from the CHS, who is not

19  in a -- is not an FBI agent?

20  A.    That's correct.

21  Q.    And he's not an ATF agent?

22  A.    Correct.

23  Q.    So he's just an individual being paid by the Government

24  for information?

25  A.    Correct.

RYAN McGEE -- CROSS-EXAMINATION                    70

1    Q.   Is he paid by the number of transactions that he makes?

2    A.   What do you mean by "transactions"?

3    Q.   So is he paid on a weekly basis or biweekly basis?

4    A.   No.

5    Q.   Is he paid based upon the information he provides?

6    A.   He is.

7    Q.   So I would consider, let's call -- information to you is

8    a transaction, so the more information that he provides to you

9    which you find beneficial or helpful, the more he's paid?

10   A.   If the information pans out, yes.

11   Q.   So would you agree that he has an incentive -- incentive

12   to broker deals?

13   A.   What do you mean?

14   Q.   To create -- I'm going to use the word "transaction."  So

15   he has incentive to create transactions?

16   A.   Could you define "create transactions?"

17   Q.   Sure.  So if he -- if he provides information to you that

18   you find beneficial, he's going to get paid?

19   A.   He was, yes.

20   Q.   If he doesn't provide information, he's not going to get

21   paid?

22   A.   Correct.

23   Q.   So it would be -- if he wants to get paid, it's incentive

24   for him to have information to provide to you?

25   A.   It is.

RYAN McGEE -- CROSS-EXAMINATION                 71

1  Q.   So he's probably actively involved to look or make

2  transactions happen so he can get paid?

3  A.   Correct.

4  Q.   So after the informant reported to you regarding the

5  January Recon, you told the CHS to continue conversations with

6  Mr. Pratchard?

7  A.   Correct.

8  Q.   Did you also direct the informant, the CHS, to set up a

9  meeting back in Arizona at a later date?

10 A.   I'm sure he was -- Mr. Pratchard returning to

11 Arizona, yes, that was planned.

12 Q.   So that was something you and the CHS would have

13 discussed and planned out?

14 A.   Yes.

15 Q.   But you're also aware that during this -- just some

16 general questions.  So from January, I'm going to say from

17 January, I don't know the exact date in January, from January

18 until -- the arrest was on June 1st; correct?

19 A.   Yes.

20 Q.   So from that time period, the CHS had several different

21 contacts with Josh?

22 A.   Yes, sir.

23 Q.   These were under your direction sometimes or always?

24 A.   I'm not sure how I could answer that.

25 Q.   So the meeting in April, that was under your direction?

1   A.   It was.

2   Q.   The meeting in the end of May and June was under your

3   direction?

4   A.   It was.

5   Q.   And during that time, the confidential CHS was around

6   Josh when he had weapons?

7   A.   He was.

8   Q.   He shot weapons with Josh?

9   A.   He did.

10  Q.   And he went to his house in San Diego?

11  A.   He did.

12  Q.   And nothing unusual or bad happened to the CHS?

13  A.   No.  No.  The CHS was never harmed in any way, no.

14  Q.   Okay.  Never -- never any incident between Josh and that

15  CHS of, like you said, a firearm or disagreements, arguments?

16  A.   They -- the CHS had reported that, during the April

17  incident, that Josh, Mr. Pratchard, would become extremely

18  upset over seemingly innocuous things, such as a dead battery

19  in a set of NVGs.

20       I think they had disagreements.  I think the CHS was

21  concerned about his reaction to certain things, and he

22  definitely made that apparent to myself, but there was never a

23  physical altercation.

24  Q.   But -- but would you -- can I say that the CHS never felt

25  that he was in danger from Josh?

1    A.   I can't say that, no.  I believe at times he felt very

2    uncomfortable, but he never -- there were times that he felt

3    very uncomfortable around Mr. Pratchard.

4    Q.   Now, isn't it true that, when Josh came back to Arizona

5    in April, that was because the CHS had told Josh that there

6    was a job opportunity for him here?

7    A.   No.  That's not correct, not in April.

8    Q.   Would that have been at the end of May and June?

9    A.   Yes, that's correct.

10   Q.   So then April was simply a training opportunity, training

11   op?

12   A.   Initially, Mr. Pratchard and CHS were supposed to meet --

13   Mr. Pratchard invited the CHS and the CHS's wife to Phoenix

14   because Mr. Pratchard and Mrs. Pratchard, based on the

15   conversations reported by the CHS, that they were going to

16   meet for -- to attend spring training games, because the

17   Pratchards are big fans of -- they enjoy baseball.

18        So initially Mr. Pratchard invited the CHS and the CHS's

19   wife to -- up to Phoenix to spend the day or a few days with

20   them, but then Mr. and Mrs. Pratchard ended up not coming out,

21   so then they -- Mr. Pratchard came down for -- in April just

22   to spend time with the CHS and to -- he ended up selling the

23   weapon there.

24   Q.   But that was -- was that -- so that was -- let me just

25   clarify, because I didn't understand.

1      When he came in April, that was coordinated by the CHS?

2    A.   With my direction, but yes, the CHS coordinated

3    it, because they were initially -- initially Mr. Pratchard

4    intended to sell the weapon to the source at -- in Phoenix,

5    when they were visiting for the baseball event.

6    Q.   And so that didn't transpire, but the CHS wanted that to

7    happen because I'm sure he would have been paid for the

8    transfer of the weapon.

9    A.   Correct.

10   Q.   So he set up something else where Josh or Mr. Pratchard

11   could meet him in the Tucson area?

12   A.   Correct.

13   Q.   Now, in the end of May and early June, that's when the

14   CHS presented to Josh a job opportunity?

15   A.   Correct.

16   Q.   What company or what organization would that have been

17   for?

18   A.   It was for a company that's called Global Intel.

19   Q.   Okay.  What do they do?

20   A.   Global Intel is a -- if you do a general Google search --

21   the CHS does not actually work for that company.  Global Intel

22   exists, but the CHS does not -- is not an employee of that

23   company.

24   Q.   What does Global Intel do in southern Arizona?

25        MS. ANDERSON:  Okay.  Relevancy, Your Honor.

```
1              THE COURT:  Overruled.
2    BY MR. MARBLE:
3    Q.   So you can answer.
4    A.   The actual company Global Intel?  I don't know.
5    Q.   You don't know?
6    A.   No, I don't know.
7    Q.   Did the CHS provide you this information, or did you
8    provide information to the CHS about a Global Intel job?
9    A.   No, the CHS, as a cover, when he would discuss what he
10   does when he's attending certain border operations and things
11   of that, would tell people -- he came up with that story on
12   his own, that he worked for a company called Global Intel, and
13   that's why he was in the area.
14   Q.   Does Global Intel have a base off Langley Road on Highway
15   86?
16   A.   No, they do not.
17   Q.   Is that a private residence?  Is that the residence of
18   the Kings?
19   A.   It is.  Mr. -- the CHS also lives there.
20   Q.   Would you agree that the confidential human source
21   encouraged or -- encouraged Mr. Pratchard to bring his weapon
22   back to Arizona in April because he wanted to purchase it?
23   A.   They had mutual --
24              MS. ANDERSON:  Objection, Your Honor, to the word
25   "encouraged."
```

1          THE COURT:  No, I think he can answer it, if he can.

2  A.   The CHS and the subject mutually agreed to sell a weapon

3  or to -- I'm sorry.  Mr. Pratchard agreed to sell a weapon to

4  the CHS, and the CHS agreed to purchase it in April.

5  Q.   Okay.  I think that answers.

6          And when Mr. Pratchard brought a different weapon on that

7  occasion, because he didn't bring the weapon that was

8  originally discussed, I think the .300 Blackout we talked

9  about, the CHS still wanted to purchase it?

10 A.   He wanted to purchase a weapon, yes, sir.

11 Q.   Correct.

12 A.   Excuse me.

13 Q.   And he was -- throughout the course of, I'm not sure, I

14 think that's -- would you agree with me that, in April, from

15 about April 10th to the 14th, when they had their -- the

16 interactions here outside of Tucson?

17 A.   Yes, that's when the -- he arrived.

18 Q.   And would you agree, I can -- would you agree that,

19 during that course of time, the CHS, from some of the audio we

20 have, or if that's an audio recording, asked him several times

21 to purchase the weapon?

22 A.   That's correct, yes.

23 Q.   Did he receive a bonus for that transfer of the weapon in

24 April, or payment?

25 A.   He received -- he received payment for the time that he

RYAN McGEE -- CROSS-EXAMINATION                    77

1   spent and -- with Mr. Pratchard, yes.

2   Q.   If Mr. Pratchard hadn't sold him the weapon, would he

3   still have received payment?

4   A.   He would have, yes.

5   Q.   Would it have been a different amount?

6   A.   I believe so, yes.  It would have been slightly less.

7   Q.   I want to ask you a couple questions about the San Diego

8   search warrant.

9        Does Melissa Pratchard also live at that residence in San

10  Diego?

11  A.   She does.

12  Q.   Have you ran a background check on her?

13          MS. ANDERSON:  Objection.  Relevancy.

14          THE COURT:  Overruled.

15  A.   A background check to consist of what?

16  Q.   Let me ask you a different question.  Can she legally

17  possess a weapon?

18  A.   She can, yes.

19  Q.   Were the weapons in a locked safe?

20  A.   They were.

21  Q.   Were you present at the serving of the search warrant in

22  San Diego?

23  A.   I was not, no.

24  Q.   You were in Tucson?

25  A.   Yes, sir.

1  Q.   Were you present when Mr. Pratchard was arrested at the

2  Casino Del Sol?

3  A.   I was, yes, sir.

4  Q.   Did you -- did you participate in serving a search

5  warrant on the Ford F150 truck?

6  A.   Yes, I was there.

7  Q.   Would you agree with me -- let me just ask you this

8  question.  Do you remember the time frame of the Arizona

9  Border Recon mission in January, the exact dates of that

10 mission?

11 A.   No, sir, I don't.  I know that Mr. Pratchard -- I believe

12 Mr. Pratchard was there from January 27th until February 1st,

13 if memory serves.

14 Q.   Okay.  So --

15 A.   I don't remember the total duration of the operation.

16 Q.   I'll refer to it then -- I don't know either, so I'll

17 refer to that mission as the end of January mission.

18      So from the end of January until June 1st, Mr. Pratchard

19 was here in the end of January?

20 A.   He was.

21 Q.   He was here in the middle of April?

22 A.   He was.

23 Q.   And then he was here the end of May until June 1st, when

24 he was arrested?

25 A.   Correct.

1  Q.   And in the interim, did you have any surveillance of him

2  in San Diego?

3  A.   In San Diego, I believe --

4              MS. ANDERSON:  Objection.  Relevancy.

5              THE COURT:  No.  Overruled.

6  A.   In -- once the search warrant -- once we discussed with

7  the FBI personnel in San Diego, they conducted, I believe,

8  just drive-by surveillance to take a look at the apartment,

9  once they knew what it was, but there was never any

10 surveillance team assigned to follow Mr. Pratchard at any

11 time.

12 Q.   And you also had the information from the CHS who visited

13 him at his house there as well?

14 A.   What information are you referring to, sir?

15 Q.   When the CHS went to stay with Josh and --

16 A.   Are you saying the CHS gave -- provided -- you just

17 referenced information.

18 Q.   I would -- I would assume -- I'm sorry.

19      I would assume the CHS provided you information from his

20 visit to Josh in San Diego.

21 A.   He did.

22 Q.   And he was probably paid for that visit as well.

23 A.   He was, yes.

24 Q.   Would you agree with me that from -- if we're taking the

25 -- from the time that there was an alleged transfer on April

1  14th -- I believe that was -- is that the correct date, April

2  14th, from the complaint, the transfer of the weapon, on April

3  14th?

4  A.   The first weapon, yes, sir.

5  Q.   So from April 14th to June 1st, that's about 45 days?

6  A.   Somewhere in there, yes, sir.

7  Q.   And that whole time Mr. Pratchard was out and about

8  living in the San Diego community?

9  A.   He was.

10         MR. MARBLE:  Can I have just one second, Your Honor?

11         THE COURT:  Sure.

12         MR. MARBLE:  I think just a couple more questions.

13  BY MR. MARBLE:

14  Q.   I want to back you up to just the -- it's called the

15  Global Intel story.

16  A.   Yes, sir.

17  Q.   Did you discuss with the CHS offering a fictitious job to

18  Mr. Pratchard through Global Intel?  Was that discussed with

19  you and the CHS?

20  A.   It was.

21  Q.   Okay.  And that was to get him back out to Arizona?

22  A.   Yes.

23  Q.   And during that time, you wanted to put him through some

24  -- well, make him think that he's being interviewed for a job?

25  A.   Yes.

1   Q.   Okay.  And you're aware that Josh also worked -- are you

2   aware that Josh also has worked in San Diego for a non-profit

3   called Second Chance Fields?

4   A.   I'm aware that he's involved with that.  I don't know how

5   much he works or -- but yes, I'm aware of his association with

6   that business organization.

7   Q.   Thank you.  Did you and the CHS come up with a job offer

8   for Josh?

9   A.   I believe that was the CHS.  The specific job offer, I

10  believe that was the CHS.

11  Q.   Did you discuss what the fictitious payment would be?

12  A.   No, because the CHS had previously already stated to the

13  -- he told -- as part of his cover story, he has his salary

14  and what he makes, et cetera, et cetera.  He'd already told

15  people, so we had to go with that because we didn't want to

16  change it.

17  Q.   And is -- from your information, that's a salary over six

18  figures?

19  A.   The salary is six figures, yes, sir.

20          MR. MARBLE:  Okay.  Thank you.  No further

21  questions.

22          THE COURT:  Thank you.

23          Ms. Anderson?

24          MS. ANDERSON:  I've got a couple of follow-up

25  questions.

1                          REDIRECT EXAMINATION

2    BY MS. ANDERSON:

3    Q.    Now, as the handler, you do many things with a source or

4    a confidential human source other than just telling them what

5    kind of activity to look for; is that true?

6    A.    That's correct.

7    Q.    One of the things that you do is give the CHS an

8    admonishment; correct?

9    A.    That's correct.

10   Q.    And what are some of those admonishments.  Can you tell

11   us about those?

12   A.    The CHS has to be truthful.  The CHS has to understand

13   that he's not an employee of the Government, that he -- that

14   we'll try to protect his or her identity, but we can't

15   guarantee it.

16   Q.    And how often is a CHS given these admonishments?

17   A.    Minimum, yearly, but we admonished -- this CHS was

18   admonished upon his opening, and then he was readmonished I

19   believe in mid-May, and then he was readmonished a third time

20   for specific actions that he could and could not take during

21   his -- during the time Mr. Pratchard was with him.

22   Q.    And what were those?

23   A.    That as part of the -- they were going to patrol the

24   mountains of southern Arizona, and they were instructed at no

25   time will they have any interaction with, detain, surveil, or

1  put hands on any suspected undocumented immigrants.  If they

2  see any, they are -- the CHS is instructed to immediately

3  leave the area.

4       And on the operation, the CHS needed to inform me when

5  they left for the night and immediately upon their return.

6  And the CHS was instructed -- the CHS is very familiar with

7  the area in southern Arizona, and he was instructed to keep

8  them away -- to keep Mr. Pratchard himself away from any --

9  any known undocumented or illegal smuggling routes.

10 Q.   Because that was a concern?

11 A.   It was, yes, yes, ma'am.

12 Q.   Because one thing is that the defendant expressed

13 interest in running into rip crews; correct?

14          MR. MARBLE:  Objection.  Leading the witness.

15          THE COURT:  Overruled.

16 BY MS. ANDERSON:

17 Q.   Go ahead.

18 A.   Yes, ma'am.

19 Q.   Now, one thing that Mr. Marble asked you about is making

20 transactions to get paid, and I want to ask you about that a

21 little bit.

22       Mr. Marble said that the source has an incentive to

23 broker deals.  Do you recall that line of questioning?

24 A.   Yes, ma'am, I do.

25 Q.   And he used the word "transactions," and I'm not sure

1    what the context meant for "transactions," but as any

2    confidential human source, they get paid for information that

3    they provide; is that correct?

4    A.    Some sources do get paid.   Other sources refuse payment.

5    They do it simply for patriotism or pro law enforcement.

6    There is a variety of reasons that they do it.   Some get paid;

7    some don't get paid.

8         In this instance, the CHS's motivations were monetary

9    compensation and patriotism and pro law enforcement

10   ideologies.

11   Q.    So are they -- does the source -- Mr. Marble painted a

12   picture as if the source was encouraging Mr. Pratchard to sell

13   the weapon out of an -- almost as an inducement or an interest

14   in him getting paid more.

15        Do you understand my question?

16             MR. MARBLE:   I'm going to object to that question.

17   I think it's --

18             THE COURT:   I'm not sure there was a question.   Was

19   there a question?   What is the question?

20   BY MS. ANDERSON:

21   Q.    Well, Mr. Marble on cross-examination was using the word

22   "transaction" and seemed to insinuate during his questioning

23   of you that the source would almost induce the defendant to

24   sell him the gun out of an interest of getting paid money.

25        Now, my question, once I move forward, is did the

1    defendant appear to be a willing participate?

2    A.   Yes, he was.

3               MR. MARBLE:  Objection.  Calls for speculation.

4               THE COURT:  No.  That's overruled.

5    BY MS. ANDERSON:

6    Q.   How many hours of transcripts have you listened to and

7    audio recordings?

8    A.   I lost count.  I don't know.  We have several recordings

9    over -- it's, I would say, a couple dozen.

10   Q.   So this -- these are audio recordings and video

11   recordings of the defendant; correct?

12   A.   Yes, ma'am.

13   Q.   So you've had a chance to listen to the defendant in his

14   own words as he was out with the CHS; correct?

15   A.   Yes, ma'am.

16   Q.   Now, based on your review of the transcripts, did the

17   defendant appear to be a willing participant in these

18   transactions?

19   A.   Yes, he was.

20   Q.   Did the defendant appear to like the company of the CHS?

21   A.   Yes, he did.

22   Q.   In fact, the defendant was not allowed to participate in

23   Arizona Border Recon; correct?

24   A.   After the first operation, yes, ma'am.

25   Q.   But the CHS -- I'm sorry.  Mr. Pratchard, the

1  defendant, continued to come back to Arizona; is that right?

2  A.   That's correct.

3  Q.   On cross-examination, defense counsel asked you whether

4  you orchestrated or put into place the defendant coming back

5  to Arizona, and I think this was in the April -- the April

6  visit.

7  A.   Yes, ma'am.

8  Q.   Did you orchestrate that?

9  A.   I discussed with the CHS the possibility of him coming

10  back.  We -- I wanted to see if Mr. Pratchard was willing to

11  come back.  So if he was -- if he was willing to come

12  back, that meant that he seemed serious about selling the

13  rifle and conducting border operations.

14  Q.   The meetings in May and June, were those under your

15  direction?  In other words, did you orchestrate those?

16  A.   I did.

17  Q.   What do you mean by "orchestrate those"?

18  A.   The -- the CHS and the -- and Mr. Pratchard had agreed to

19  the transfer of another rifle.  The CHS agreed to purchase it,

20  and Mr. Pratchard agreed to sell it.  The source wired

21  Mr. Pratchard $1800 in early May, and they scheduled a -- they

22  scheduled to come out to conduct another border operation, but

23  also to transfer -- to sell the weapon.

24  Q.   So the CHS transferred money to the defendant; correct?

25  A.   He did.

1   Q.   At whose direction?  That was Mr. Pratchard; correct?

2   A.   Correct, and Mr. Pratchard requested a down payment for

3   the items.

4   Q.   This particular CHS provides information on several other

5   matters; is that correct?

6   A.   Yes, ma'am.  He provides information on several cases.

7   Q.   Was the FBI concerned about the defendant being on the

8   streets?

9   A.   Yes.

10  Q.   Tell us why.

11  A.   Initially, we believed that the -- we weren't sure how --

12  how many weapons he was making and who he was making them

13  for, so initially, we wanted to introduce -- we wanted to find

14  -- to see if he was part of a network of selling weapons, how

15  many people he sold weapons to.  He obviously gave weapons to

16  his brother and we believe other family members.

17       We weren't initially sure how many weapons he sold, so

18  that was initially our -- our main motivation for not

19  arresting him immediately.  But then the -- the risk of

20  leaving Mr. Pratchard in the community outweighed any possible

21  -- any possible additional -- forgive me.  I want to make sure

22  I say this right.

23       The risk wasn't worth the reward regarding keeping --

24  allowing Mr. Pratchard to stay in the community.

25  Q.   Now, the defendant has produced and provided firearms to

1  family members; correct?

2  A.   According to his own words in the transcription, yes.

3  Q.   Do you know how many firearms defendant has produced for

4  his family?

5  A.   No, ma'am, I do not.

6  Q.   And do you know whether or not he has produced firearms

7  for his family who is in close proximity to where he lives in

8  San Diego?

9         MR. MARBLE:  Objection.  Outside the scope of cross-

10  examination, Your Honor.

11        THE COURT:  I'm going to let -- I'm going to let you

12  -- if you want to recross on that, you can.

13        You can answer.

14  A.   Could you repeat the question, ma'am?

15  Q.   Sure.  Now, I think you just said that we don't

16  know, meaning the FBI does not know, how many firearms, how

17  much ammunition, the defendant has produced and provided to

18  his family members.

19       Is that correct?

20  A.   That's correct.

21  Q.   He's admitted that he did produce firearms for family

22  members, but FBI has does not know how many; correct?

23  A.   That's correct, ma'am.

24  Q.   That being the case, we don't know how many he has

25  produced for family members that are in close proximity to

1   where he lives in San Diego?

2   A.   That's correct, ma'am.  We don't know.

3           MS. ANDERSON:  Let me just check my notes, Your

4   Honor.

5           That's all I have.

6           THE COURT:  Okay.  Sir, I have a couple questions.

7           I can't remember from the morning, was the

8   confidential human source involved in that January/February

9   militia group?

10          THE WITNESS:  Involved how so, sir?

11          THE COURT:  Was he present with Mr. Pratchard?  Was

12  he part of that militia group?

13          THE WITNESS:  He's not part of the group, but he did

14  attend the event.

15          THE COURT:  So he attended the event with

16  Mr. Pratchard?

17          THE WITNESS:  He was at the same event, if that's

18  what you mean, sir.

19          THE COURT:  Right.

20          THE WITNESS:  Yes, sir.

21          THE COURT:  Did they patrol the border together, do

22  you know?

23          THE WITNESS:  I don't know exactly what they did.

24  Usually the standard operating procedure for Arizona Border

25  Recon is they will occupy a general area, and they'll

1  basically sit on mountaintops, because the way smuggling --

2  drug smuggling routes and things like that work is the cartels

3  will usually have a scout sitting on a hill, and they'll just

4  be communicating as to where they want the individuals, drugs,

5  what have you, to come through.

6          Arizona Border Recon essentially saturates an area

7  and attempts to divert the people, drugs, that are coming

8  across the border, to where -- they set up strategically to

9  where they want -- they try to direct the groups coming across

10  the border into border patrol custody.

11          THE COURT:  Okay.  But I take it this confidential

12  human source didn't provide you with any information about

13  what Mr. Pratchard or any of the other militia members did

14  during that time frame.

15          THE WITNESS:  Specifically regarding the border

16  operation, sir?

17          THE COURT:  Right.

18          THE WITNESS:  I don't believe so.

19          THE COURT:  Whether they encountered people crossing

20  and so forth.

21          THE WITNESS:  I don't want to say yes or no, sir.  I

22  don't remember the specifics, because the main thing that he

23  reported on after that was Mr. Pratchard.  I'm sure that he

24  reported on some of the activity, but I don't know -- I don't

25  remember the specifics of that.

1          THE COURT:  Okay.  All right.  And then at some

2    point, when you were discussing how the CHS was admonished and

3    given the admonishments, you mentioned, I think, that there

4    was a plan for Mr. Pratchard and the confidential human source

5    to patrol the mountains of southern Arizona and do border

6    operations.

7          Did that actually happen?

8          THE WITNESS:  They went on a land nav route onto --

9    they didn't bring any weapons.  They went out just to

10   checkpoints.

11         THE COURT:  Okay.  How many times?  Do you know?

12         THE WITNESS:  Just at the -- in the May/June?

13         THE COURT:  I guess in total.

14         THE WITNESS:  In total, I believe when they were out

15   in April they went out a handful of times, three, three

16   times, maybe, I'm not sure, but when they came out -- when

17   they did it in May, it was only once.

18         THE COURT:  Did they have weapons on any of those

19   occasions?

20         THE WITNESS:  I don't know, sir.  I'm not sure.  I

21   believe they did.

22         THE COURT:  You believe they did?

23         THE WITNESS:  Yes, sir.

24         THE COURT:  Was the confidential human source

25   allowed to possess a weapon, either by law or pursuant to the

1  agreement that the confidential human source had with you all?

2           THE WITNESS:  He doesn't really have a legal

3  agreement.  He's not working off charges.  But he is

4  authorized to carry weapons, yes, sir.

5           THE COURT:  Okay.  But you didn't -- as part of your

6  admonishments, you've never told him you can never have a

7  weapon?

8           THE WITNESS:  Correct.

9           THE COURT.  Okay.  That's all I have.

10          Any follow-up questions?

11          MS. ANDERSON:  No, Your Honor.

12          MR. MARBLE:  Can I clarify one matter?

13          THE COURT:  Sure.

14                    FURTHER EXAMINATION

15 BY MR. MARBLE:

16 Q.   On the -- on the -- so on the air -- excuse me.

17      On the recon mission, what would be I think either April

18 or -- the April one, you said that they went on a mission but

19 without weapons?

20 A.   That was in May.

21 Q.   Okay.  In May.  I'm sorry.  So the operation in May they

22 went on an overnight but without weapons?

23 A.   No, it was without weapons.  It was only a couple of

24 hours, but it was a nighttime land navigation exercise.

25 Q.   Okay.  But without any weapons?

1  A.   Correct.

2           MR. MARBLE:  Okay.

3           THE COURT:  Okay.  And then so you can step down.

4  Thank you.

5           THE WITNESS:  Thank you, sir.

6           THE COURT:  So Ms. Anderson, you don't have any more

7  witnesses; right?

8           MS. ANDERSON:  No, Your Honor.  That's correct.

9           THE COURT:  Okay.  And Mr. Marble, you still don't

10  have any witnesses; correct?

11          MR. MARBLE:  I don't have witnesses, but I do have

12  documents I'd like to admit for the Court to review.

13          THE COURT:  Sure.

14          MR. MARBLE:  Those are Exhibit 51, which is a letter

15  of recommendation.  I'd move to admit that exhibit.

16          THE COURT:  Okay.  And Ms. Anderson, any objection?

17          MS. ANDERSON:  No, Your Honor.

18          THE COURT:  Okay.

19          MR. MARBLE:  And then Exhibit 52, Your Honor, is

20  actually a compact disk that contains clips of the Second

21  Chance Fields nonprofit that Mr. Pratchard works at.

22  There's -- for the Court's information, we have -- I know this

23  courtroom's kind of set up for playing them, but I have a

24  compact disk for the Court.  There is four separate clips.

25              The total of four clips in total is probably about

1   10 to 11 minutes explaining what Second Chance Fields is and

2   what Mr. Pratchard does for that organization.

3          THE COURT:  Is it like a video of the people

4   actually doing work or just, like, a promotional video?

5          MR. MARBLE:  No, it's -- most of them are news

6   reports regarding what that organization has done in the San

7   Diego community, and Mr. Pratchard is in those clips.  In

8   addition, there's kind of a question and answer, so people,

9   through the news, get to know what that is.

10         THE COURT:  Okay.  And then, Ms. Anderson, do you

11  have any objection?

12         MS. ANDERSON:  No, Your Honor.

13         THE COURT:  Okay.  So that will be admitted as well,

14  and I'll take a look at that.

15         So did you all want to argue the motion today?

16         MS. ANDERSON:  I'm prepared.

17         THE COURT:  Okay.

18         MR. MARBLE:  Yes.

19         MS. ANDERSON:  Okay.  Thank you.

20         Judge, first of all, it's the Government's position

21  that the defendant is both a flight risk and a danger to the

22  community.

23         First of all, we would proffer the allegations in

24  the complaint in support of probable cause.  I'd point out to

25  the Court that pretrial services finds the defendant both to

1    be a flight risk and a risk of danger to the community, and

2    it's the recommendation of pretrial services that the

3    defendant be detained, and the Government concurs with that

4    recommendation.

5            Now, first of all, I want to talk about the flight

6    risk.  First of all, the defendant lacks ties to this

7    community.  He lives in San Diego.  He lives in San

8    Diego, which is close to the border.  And the defendant is

9    looking at some serious criminal charges both here in and San

10   Diego, based on the items that were found in his house and

11   also the items that were found in his vehicle on June

12   1st, including the fact that he has sold the two different

13   firearms to the CHS.

14           We feel that he poses a risk of nonappearance based

15   on his past foreign travel, his past and current drug

16   use, Your Honor, his mental health issues, and his prior

17   noncompliance with conditions of probation.  And his

18   noncompliance pertains to the three years of probation that he

19   was placed on.  However, he violated the terms and conditions

20   and had his probation revoked.

21           Next, Your Honor, the Government believes, and this

22   is the most compelling portion of the argument, the Government

23   believes that he is a danger to the community.  And pretrial

24   services also believes that the defendant poses a risk of

25   danger to the community.

1          And first of all, Your Honor, it's clear in looking

2    at all of these records, it's very clear that rules, laws,

3    restrictions, conditions of probation supervision, mean

4    absolutely nothing to the defendant.

5          He's been convicted of a felon -- of a felony, two

6    felonies.  He's a prohibited possessor.  But that means

7    nothing to him.  That means nothing to him.  He can't buy

8    firearms.  He can't buy ammunition.  So what's he do?  He

9    makes it.  He makes it himself in his apartment in San Diego.

10   And we have -- one of our exhibits includes photographs of all

11   of the equipment that he's got in his apartment in San Diego.

12         In his vehicle when he was arrested, he had three

13   firearms.  One was a .45 pistol, one was a short-barreled

14   rifle, which is a prohibited firearm in and of itself, the AR,

15   and he had in excess of -- I believe it was in excess of 200

16   rounds of ammunition just in his car.

17         The next factor that we need to look at in examining

18   his dangerousness and the risk to the community is that he

19   sold two firearms and ammo to the confidential human source.

20         Next, Your Honor, is Exhibit 2, which is also

21   extremely compelling.  According to the police reports, and

22   this is all in Exhibit No. 2, the defendant, on October 13th

23   of 2007, got in a -- severely beat the victim, who is listed

24   in the report.

25         Now, these reports, I don't see anything in these

1    reports about a fight with anybody else other than the victim.

2    According to the victim's statement or one of the witness'

3    statements, "We were mistaken for another party."

4            According to the one of the police officers who

5    responded to the scene, "I was escorted by Officer Withers to

6    an unconscious male victim lying in a pool of blood on a

7    festival pavilion floor.  The male was later identified as

8    Derrick Sanders by medical personnel.  Sanders was being

9    treated by Medic 51 and was later transported to the hospital.

10           "While checking on Sanders, I was approached by a

11   male later identified as Isaac York.  York stated he witnessed

12   the assault and was able to catch the incident on video.  York

13   showed me the footage on his portable video camera of a male

14   dressed in the same clothing as Pratchard.  The male in the

15   video is shown using his foot in a stomping matter to strike

16   another male lying on the floor of the festival pavilion."

17           Your Honor, this -- it appears that the victim was

18   completely unknown to the defendant.  The defendant -- I'm

19   sorry.  The victim in his statement says, "He continued by

20   stomping on my face until he was pulled off."  That was on

21   October 13th of 2007.  The victim suffered a broken nose, a

22   fractured jaw, and a concussion.

23           The defendant was convicted of this felony on

24   October 21st of '09, and he was placed on probation.

25   However, his probation was revoked, and he was sent to the

1   Bureau of Prisons for one day, and his supervisor -- his

2   probationary period was extended as a result of that.

3            Next, Your Honor, on March 9th of 2014, we've got

4   battery on a spouse, and this is Exhibit 5.  And during this

5   exchange, the officers put statements from Melissa Pratchard

6   in the report.  "Melissa stated there had been several

7   incidents in the past where Joshua was very aggressive with

8   her verbally but had never battered her in the past."

9            And then she went on to articulate for the officer

10  the events of what happened.  And again, she said, "We went to

11  a church class.  They were talking a lot about marriage.

12  Joshua felt bad and left early from the class because he felt

13  that some of the things they were talking about in the class

14  that he was doing.

15           "We got home and Joshua was not talking to me.  I

16  grabbed my journal and rode my beach cruiser to the beach.  I

17  wrote in my journal for a while and then went back home.  When

18  I got home, Joshua was mad at me.  He was upset that I left,

19  and I did not stay to comfort him.  He then calmed

20  down, hugged me, and apologized.

21           "Joshua then started watching television in the

22  living room and went to the bedroom and started to work on

23  homework.  A short while later, Joshua walked into the room

24  screaming at me.  He was upset about a text that I had sent

25  him earlier when I left explaining the way I felt about the

1    way he was acting."

2         She then goes on to describe about, "I grabbed one

3    of the pill bottles and threw it at me.  He said it was my

4    Vicodin.  The bottle hit me in the arm."  Then the defendant

5    told his wife that she had five seconds to leave or he was

6    going to hurt her.  He grabbed her by her arms, picked her

7    up, and threw her on the bed.  At that point she called the

8    place, and he said, "Go ahead," and he walked away.

9         Your Honor, this account demonstrates that the

10   defendant is mentally unstable.  He's got mood swings, and he

11   is just a risk to not only other people around him which he

12   doesn't know, but also to his family.

13        Furthermore, Your Honor, the search warrant on his

14   house revealed eight firearms in the house.  And again, we

15   don't know what other firearms he will have access to if he's

16   allowed to be released.

17        The defendant has used and distributed ecstasy,

18   which is a Schedule I drug that pertains to his conviction in

19   the military.  He's currently taking a large amount of

20   opioids.  He's used violence against strangers and his own

21   wife.  We don't know how many firearms are in the San Diego

22   area that he has given or sold to other individuals.

23        More importantly, we think he's -- his record

24   demonstrates that's completely mentally unstable, and he's a

25   risk to the community, and it's our position that he should be

1   detained.

2             THE COURT:  Okay.  Thank you.

3             Mr. Marble?

4             MR. MARBLE:  Your Honor, I'd like to remind the

5   Court that I think the Court asked us on Wednesday, and I

6   wasn't -- we were setting up the hearing today, but I wanted

7   the Court -- I do not believe this is a presumption case.

8             THE COURT:  That was going to be my next question.

9             MR. MARBLE:  Yeah, this is -- if the Court were --

10  I'd refer the Court to 3142(e)(3).  None of -- there's

11  (A), (B), (C), (D) of subsections.  None of those fits the

12  qualifications of what we're looking at today.

13            (A) would be probable cause to believe that the

14  person committed a drug offense with a maximum term of 10

15  years.  That's not charged in this complaint.  An offense

16  under 924(c).  That's not charged.  956(a), Your Honor, is I

17  believe threatening a foreign official, to kidnap a foreign

18  official.  The 2332b(g)(5)(B) is acts of terrorism where the

19  maximum imprisonment is 10 years.  That's not charged.

20            An offense under chapter 77, Your Honor, is the --

21  the 1591 sex trafficking, the sex trafficking of a minor.

22  That doesn't apply.  And then the last one, (E), are an

23  offense involving minor victim under section -- it listed

24  several sections.  None of those are listed in the complaint,

25  Your Honor.  So this is not a presumption case, from our

1   position.

2          As the Court's aware, the Court's job today is to

3   determine if there is a condition or combination of conditions

4   that will reasonably assure Mr. Pratchard's appearance for

5   future court appearance, and as the Government presented

6   evidence, obviously, for the dangerousness, there has to be a

7   danger to another person, which I don't think they've

8   established whatsoever, or I think to the community.

9          That evidence has to be by clear and convincing

10  evidence, Your Honor, from the United States vs. Gerbo, which

11  is still good law, from 1991.  So I would refer the Court that

12  there are conditions that can be placed upon Mr. Pratchard

13  that would assure that he's going to appear in court and also

14  to relieve any concerns of the issue of dangerousness.

15         I really don't think that the Government presented

16  much if any evidence of a flight risk for Mr. Pratchard.  He's

17  not a flight risk, Your Honor.  He's -- he's not going to fail

18  to appear.  I don't think there's any evidence of a failure to

19  appear in the past, so I think that hasn't been established

20  today.

21         Regarding the danger to the community, I think

22  there's - I'm going to propose some conditions to the Court

23  that I think would help any concerns.  If he's -- obviously no

24  alcohol, no drugs, of course.  Mental health condition, if the

25  Court thinks that's necessary.  No weapons.  No weapon parts.

1    No equipment to manufacture, do any kind of manufacturing.

2            But as the Court's aware, I think that concern

3    should be relieved, because when the search warrant was

4    served, all that had been seized by the Government.  The FBI

5    has all that when they served the search warrant.  It's on the

6    inventory, and I believe it's Exhibit 30.  That's no longer in

7    his possession.

8            I think if the Court were to impose a condition of

9    no travel to Arizona except to meet with his attorney or for

10   court hearings, that would relieve any concern that he's

11   participating in any more of these operations, because it

12   seems from the evidence that we've heard today that that was

13   going to happen when he was here the one time with the Arizona

14   Border Recon and then with the CHS.

15           I don't think Mr. Pratchard's a dangerous person,

16   Your Honor.  The evidence that the Government presented for

17   that is a domestic violence incident with his wife that was

18   back in 2014 and was released from prosecution two days later.

19           The other incident from 2007 is about 11 years

20   old, and we have to look at the case not just from what's read

21   from the police reports, because that just gives us a blush of

22   what actually happened.  If that was -- I would submit to the

23   Court, if that's -- if from what the police report was the

24   only side of the whole story, I can't imagine Mr. Pratchard

25   getting probation for that, the seriousness, for the injuries

1    done to that person.

2            I can't imagine that he would only receive

3    probation.  I think that begs the question that there was

4    definitely more to the story than what we heard from that

5    recountings of the police report.

6            The incident from 2001, when he was in the military;

7    Your Honor, I believe he was 19 years old.  He finished it and

8    was released early because of his good behavior and compliance

9    with what they wanted him to do from back in 2001.

10           Your Honor, his family's here from San Diego.  His

11   wife's here from -- I'm sorry.  His family -- his parents are

12   here are, actually, from Concord, California, in the Bay Area.

13   His wife is here from San Diego.  He has very close family

14   friends here in Tucson who have been at all the court hearings

15   to support him.  They're going to make sure that, if the Court

16   releases him, that he's in complete compliance, because they

17   want to make sure he follows through with this.

18           Pretrial services, Your Honor, did find that his

19   wife, who's present, would be a suitable third-party

20   custodian, so I think that gives -- there's lots of conditions

21   the Court can impose on him to make sure complies.

22           And as the Court's aware, just to remind the

23   Court, the Court has to find in this case that there's no

24   conditions that can be placed upon him to assure his

25   appearance and to assure the compliance with -- with the case.

1          I think there's lots of conditions, if the Court's

2    really concerned -- although I don't believe he's really a

3    flight risk, electronic monitoring is the alternative to that,

4    so the Court can be aware of where he's at at all times.  So I

5    believe that there are conditions that would alleviate any

6    concerns of the case.

7          So to remind the Court of the law under 3142(g), I

8    would say the majority of the information we heard today was

9    regarding -- well, half, I would say a split, but the weight

10   of the evidence is the least factor for the Court to consider

11   under conditions of release, regarding his detention.

12         But I think his character, his physical and mental

13   condition are all conditions to be placed on him for that, his

14   close family, united family, to help him appear at everything,

15   their concern for him and wanting him to do well.

16         The Court -- while he doesn't reside in Tucson, I

17   think it's pretty common for this to happen.  We've all seen

18   where he can be released from here but reside in San Diego

19   with courtesy supervision.  I know Ms. Ramonet is here.  I did

20   not ask her that, but I think that -- I've had that happen in

21   lots of cases.  I think it's easily set up.

22         So I would ask the Court to factor -- fashion

23   conditions to assure that he appears.  I think he will.

24   That's under the best interest.  If that includes a personal

25   assurance bond or a very small financial bond of cash, I think

1    the family could -- would have some means to do that.

2            And then, again, just from some research that I did,

3    Your Honor, even if the Court finds or thinks that he's a

4    danger to the community, that would not prohibit him from

5    being released upon the conditions.  It's whether or not

6    conditions can be fashioned to assure that he is going to

7    appear in court.  So I think I've proposed conditions that

8    will assure that.

9            I would ask the Court that, since this is -- it's a

10   very serious case, however, the Bail Reform Act is liberal on

11   release, this is not a presumption case, and since there are

12   conditions that would assure his appearance in Court, that the

13   Court release him on bond conditions.

14           THE COURT:  Okay.  Thank you.

15           Okay.  Well --

16           MS. ANDERSON:  Your Honor, may I point out a couple

17   of things?

18           THE COURT:  Oh, yeah.  It's your burden, so you get

19   the last word.

20           MS. ANDERSON:  Okay.  Judge, I forgot to point out a

21   couple of portions from the transcript that I think are

22   important, so I wanted to do that at this time.

23           This is during the April 10 to April 14th visit,

24   when the defendant came out here and was spending time with

25   the CHS, and it was at that time that the CHS and the

 1   defendant were talking about coordinates, terrain locations

 2   and what -- where they were planning on going and what they

 3   were going to do.

 4          And the defendant stated, this is Government's

 5   Exhibit 29, "Does this mean we get to engage rip crews?"

 6          And the CHS says, "More likely than not.  Not

 7   looking forward to it."

 8          But the defendant says, "I am."

 9          Next, the CHS says, "Yeah, you think that?  Shit

10   gets real real quick."

11          And what does the defendant say?  "I'm looking

12   forward to it.  I want to do it.  I want to do it."

13          That's what the defendant is about.  He wants to

14   engage rip crews.

15          Mr. Marble talked about rules and conditions being

16   imposed on the defendant such as don't travel, don't travel to

17   Arizona, don't have any guns, don't have any gun parts.

18   Rules, regulations, mean nothing to the defendant.

19          Look.  Look at what was in his house.  It was an

20   armory.  It was loaded with firearms.  Look at what he had in

21   his vehicle.  You can only shoot one gun at a time, but yet he

22   had -- he had a whole stash of firearms and ammunition just in

23   his vehicle.

24          The fact that he's on some serious opioid

25   medication, you saw evidence in the police reports about his

1  anger, his anger towards his wife, his anger towards this

2  other individual, the victim in the assault with serious

3  bodily injury, it demonstrates that the defendant is not

4  stable.

5          And the Government argues to the Court that he's --

6  he's a danger to the community, and he needs to be detained.

7  There are no conditions or restrictions that can be placed

8  upon him that would protect the community.

9          Thank you.

10          THE COURT:  Thank you, Ms. Anderson.

11          MR. MARBLE:  Judge, I'm so sorry.  Can I make one

12  final point that I forgot to bring up?  I'm so sorry.

13          THE COURT:  Sure.

14          MR. MARBLE:  And that was that, I discussed with the

15  agent, but the time that elapsed, just if you look at the

16  complaint, Your Honor, these events occurred on April

17  14th, the two charges in the complaint.

18          The rest of that time Mr. Pratchard's been out in

19  the community, living with his wife in San Diego, and he

20  didn't come back to Arizona until the end of May, early June,

21  when he was arrested at the -- at the setup, the arrangement

22  with the CHS.  So during that time he's been out in the

23  community without any conditions.

24          So I think that weighs in favor of releasing him,

25  because he was out.  There were no other incidents.  And now,

1   with conditions, he's going to -- that would put more upon

2   him.  So I think that weighs -- if this was such a concern,

3   such a danger, I don't know why he wasn't arrested on April

4   14th, Your Honor.

5              THE COURT:  Okay.  Thank you.

6              Okay.  I'm going to take the matter under

7   advisement, and I'll issue a written decision.

8              Thank you, everybody.  Appreciate it.

9              (Proceedings concluded in this matter at 4:37 p.m.)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                    C E R T I F I C A T E

 2

 3        I, Erica R. McQuillen, do hereby certify that the

 4  preceding pages of typewritten matter are a true, correct, and

 5  complete transcription of the digital recording of proceedings

 6  in the above-entitled matter.

 7            Dated this 13th day of June, 2018.

 8

 9                      s/Erica R. McQuillen
                     Erica R. McQuillen, RDR, CRR
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```