1
2
3
4                     IN THE UNITED STATES DISTRICT COURT
5                        FOR THE DISTRICT OF ARIZONA
6
7    United States of America,          )
                                        )    18-mj-03091-JR
8              Plaintiff,               )
                                        )
9          vs.                          )    **ORDER**
                                        )
10   Joshua Joel Pratchard,             )
                                        )
11             Defendant.               )
     _____)
12

13          Pending before the Court is the government's motion to detain the defendant pending

14   his trial in the above captioned matter.  For the reasons that follow, that motion is granted and

15   the defendant is ordered detained pending his trial because he is a danger to the community

16   and no conditions of release can be set to ensure the safety of the community.

17                          **FACTUAL BACKGROUND**

18          On June 1, 2018, the defendant was arrested and charged with possession of a firearm

19   by a convicted felon, in violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(2), and the unlicensed

20   sale and transfer of a firearm, in violation of 18 U.S.C. § 922(a)(5).  A criminal complaint

21   dated May 25, 2018, sets forth the basis for those charges.

22          The complaint alleges that on April 14, 2018, the defendant, who had previously been

23   convicted of felony offenses, knowingly possessed a firearm that traveled in interstate

24   commerce.  Investigation revealed that this firearm was manufactured in California and

25   transported by the defendant into Arizona.  This firearm is not registered with the Bureau of

26   Alcohol, Tobacco and Firearms.  Also, on this same date, the defendant, who is not licensed

27   to deal, import, manufacture, or collect firearms, transferred and sold this firearm to an

28   individual residing in another state, and that individual was not licensed to deal, import,

1   manufacture or collect firearms.

2        The defendant had his Initial Appearance on June 4, 2018, and was ordered detained

3   pending his detention hearing and preliminary hearing set for June 6, 2018.  At the detention

4   and preliminary hearing, the government moved for the defendant's detention pending trial

5   and requested a dangerousness hearing to prove that no release conditions could ensure the

6   safety of the community.[1]

7        The dangerousness hearing took place on June 8, 2018.  The government called one

8   witness: FBI Special Agent Ryan McGee.   The defense did not call any witnesses.

9        Agent McGee testified that his primary duty as an FBI Agent is to conduct domestic

10  terrorism investigations, which includes investigations into militia groups.  (Tr. at 5.)[2]  He

11  explained that a militia group is essentially armed civilians that are united by a common

12  ideology.  (*Id*.)  Militia groups get the attention of the FBI when there are allegations that

13  they are violating federal law.  (*Id*.)

14       In the case at hand, Agent McGee was investigating a militia group known as the

15  Arizona Border Recon ("AZBR").  (*Id*. at 6.)  The AZBR was formed in 2011 and is run by

16  an individual named Tim Foley.  (*Id*.)  That group's main issue is illegal immigration along

17  the southern U.S. border.  (*Id*.)  The operational goal of the AZBR is to prevent, stop, or slow

18  down illegal immigration across the border.  (*Id*.)

19       If an individual wants to join the AZBR, he submits an application online.  (*Id*.)  The

20  application is reviewed by Mr. Foley, who decides  whether the person is allowed to join one

21  of AZBR's border operations on a probationary basis.  (*Id*.)  The probationary period allows

22  Mr. Foley to determine whether the person has what is required to serve in further border

23  operations.  (*Id*.)

24       The AZBR has rules and regulations which are published online.  (*Id*. at 7.)  The rules

25

26      [1] Pretrial Services recommended that the defendant be detained as a flight risk and

27  danger to the community.

28      [2] Citations to "Tr." followed by the page number are to the transcript of the
    dangerousness hearing held on 6/8/18.

1    and regulations are very specific on the type of weapons that can be used; for instance,
2    silencers or optics on weapons are not permitted. (*Id.*)  Also, the AZBR, in most cases, has
3    a policy against detaining suspected undocumented immigrants. (*Id.*)

4            Agent McGee's testimony then turned to a confidential human source ("CHS") that
5    reports on militia matters in the southwest. (*Id.*)  In late January of 2018, the CHS provided
6    some information on the defendant, Joshua Pratchard. (*Id.*)  The CHS reported that the
7    defendant came to southern Arizona from his home in San Diego to attend one of AZBR's
8    border operations during the time period of January 27, 2018 to February 1, 2018. (*Id.* at 7-
9    8.) During that operation, the defendant  became visibly angry "when he was informed that
10   he was not allowed to have a silencer on his weapon and also that he was not allowed to go
11   hands-on, meaning physically . . . detain or otherwise restrain any suspected undocumented
12   immigrants." (*Id.* at 7.)  Because of that behavior, the defendant  was  not  allowed  to
13   participate in future border patrol operations with AZBR. (*Id.* at 8.)

14           The defendant developed a relationship with the CHS during the border operation and
15   that relationship continued even though the defendant was not permitted to further participate
16   in the AZBR. (*Id.* at 22.)   The defendant had contact with the CHS between April 9-14,
17   2018, and May 30-June 1, 2018, when the defendant traveled to Arizona. (*Id.* at 23.)  The
18   CHS traveled to San Diego to meet with the defendant from April 26-28, 2018. (*Id.*)  The
19   CHS stayed with the defendant in his apartment.  (*Id.*)[3]

20           As a result of the meetings between the defendant and the CHS, Agent McGee learned
21   generally that the defendant both possessed and manufactured firearms and ammunition at
22   his residence in San Diego, and was willing to sell firearms and ammunition. (*Id.* at 24.)
23   Agent McGee also learned that the defendant has a certain sophistication and knowledge
24   about firearms, and has equipment in his home to make firearms and ammunition. (*Id.* at 24-
25   25.)

26

27          [3]  These contacts between the CHS and the defendant were recorded.  However, each
28   and every conversation during these extended time periods was not recorded because the
     battery in the recorder lost power.

1    During the meetings in Arizona between the defendant and the CHS from April 10-14,
2    2018, the defendant mentioned that he manufactures ammunition and firearms and showed
3    the CHS some of the firearms that he had made.  The defendant also talked about the science
4    of making subsonic ammunition and firearms.  The defendant told the CHS that he initially
5    thought that short-barrel rifles were only illegal in California, but had since learned that they
6    are illegal in every state.  The defendant mentioned that when he came to Arizona for the
7    AZBR operation, he had such a weapon, and it would have been bad for him if Border Patrol
8    or law enforcement saw him with that weapon.  (*Id.* at 34.)  The defendant sold the CHS a
9    short-barrel rifle which was not registered -- the defendant made up the serial number on the
10   firearm.  (*Id.* at 34-35.)   The defendant told the CHS that he made his brother a nine
11   millimeter with a seven-inch barrel.  (*Id.* at 35.)   The defendant told the CHS that he is
12   concerned about sheriffs and federal law enforcement seeing the firearms that he makes and
13   possesses.  (*Id.* at 37.)

14    The defendant and the CHS also discussed coordinates and terrain locations for where
15   they were planning to conduct border operations.  The defendant asked the CHS whether
16   they "get to engage rip crews," which are people in the desert that steal drugs or cash loads
17   from undocumented immigrants coming across the border.  (*Id.*)   The CHS tells the
18   defendant that it is likely they will see rip crews, but is not looking forward to it.  The
19   defendant responds that he is looking forward it and wants to do it.  (*Id.* at 37-38.)   The
20   defendant and the CHS conducted some border patrol surveillance operations without
21   weapons in late May 2018 when the defendant came to Arizona.  (*Id.* at 91.)

22    During the meetings in San Diego between the defendant and the CHS from April 26-
23   28, 2018, the defendant said that he can make as many blackout rifles as the CHS can
24   purchase.  Agent McGee testified that at some point during one meeting (in late April 2018)
25   between the defendant and the CHS, the defendant tells his dog: "Who's that?  Go get him.
26   Go get him.  Go get that Mexican."  (*Id.* at 39.)

27    Agent McGee's testimony then turned to the search of the defendant's truck when he
28   was arrested as well as the search of his home.  When the defendant was arrested on June 1,

2018, agents found three firearms in his vehicle, 290 rounds of ammunition, and a suppressor/silencer attached to one firearm. (*Id.* at 45-46, 53.) A search of the defendant's home in San Diego resulted in the seizure of the following items of interest: (1) eight firearms; (2) a large quantity of ammunition; (3) six containers of black powder which is used to reload ammunition; and (4) a reloading press. (*Id.* at 56-57.)

Finally, Agent McGee testified about the defendant's criminal history. The defendant was convicted in a general court martial under the Uniform Code of Military Justice. (*Id.* at 10.) He was convicted of four counts, each of which carried a maximum penalty exceeding one year in prison: one count of use of ecstasy and three counts of distribution of ecstasy. (*Id.*; Gov. Ex. 1.) The defendant was sentenced to three years imprisonment. (Tr. at 11; Gov. Ex. 1.)

On October 21, 2009, the defendant was convicted of the felony offense of assault resulting in serious bodily injury in the United States District Court for the Northern District of California. (*Id.* at 16; Gov. Ex. 4.) This offense stemmed from an altercation with another individual on October 13, 2007 at an Oktoberfest public gathering. (*Id.* at 11-12.) The police reports from that incident state that the defendant and two of his associates approached the victim, who was punched and fell to the ground. (*Id.* at 12; Gov. Ex. 2.) The defendant then stomped on the victim's face with his foot. (*Id.*) When law enforcement arrived at the scene, they had to pull the defendant off the victim. (*Id.*) The victim suffered a broken nose, a fractured jaw, and a concussion. (*Id.*) The defendant was sentenced to three years probation for the offense. (Tr. at 16; Gov. Ex. 4.)

The defendant was arrested on a domestic violence charge on March 9, 2014. (Tr. at 17; Gov. Ex. 5.) The charge stemmed from an alleged battery on his current spouse, Melissa Pratchard. (*Id.*) The police reports from responding officers state as follows. The defendant became angry at his wife and began throwing things around the house. (Tr. at 19.) The defendant told his wife she needed to leave the house but she refused to do so. (*Id.*) The defendant's wife reported that "Joshua then got in my face and told me I had five seconds to leave or he was going to hurt me. Joshua then grabbed me by both of my arms, picked me

1  up, carried me over to the room and threw me on the bed." (*Id.*) The defendant's wife called

2  the police, who responded and arrested the defendant. (*Id.* at 19-20.) This arrest did not

3  result in a conviction, apparently because Mrs. Pratchard did not want to press charges.

4     Agent McGee testified that the defendant is a prohibited possessor of firearms as a

5  result of his felony convictions, and he has never had (or applied to have) his right to possess

6  a firearm restored.   (*Id.* at 21.)

7     On cross-examination, Agent McGee conceded that the defendant would likely not

8  have been invited to participate in the border operation with AZBR if he did not pass that

9  group's background check. (*Id.* at 60-61.) However, Agent McGee did not know if AZBR

10  performed any kind of background check. (*Id.* at 61.)

11     With regard to the court martial, defense counsel pointed out that Agent McGee

12  referred to those convictions as "felonies," and asked him if he knew whether military courts

13  used the terms "felonies" or "misdemeanors." Agent McGee testified that he has never been

14  involved with a court martial, but he received information from a task force officer who is

15  an NCIS agent that a conviction in a general court martial is the equivalent of a felony.

16  Agent McGee conceded that although the military branch involved in the court martial must

17  report the conviction to law enforcement, that is not always done. (*Id.* at 63-64.)   Agent

18  McGee agreed with defense counsel that the defendant was paroled early from his sentence

19  because of the work he did through the military. (*Id.* at 64.)

20     In regard to the felony assault conviction, Agent McGee testified that he was not

21  aware of whether the defendant was defending himself; he had only read the police reports

22  and had not viewed the video that exists of that altercation. (*Id.* at 64-65.)

23     As to the domestic violence arrest, Agent McGee agreed that the police reports from

24  that incident reflect that the defendant's wife did not have visible injuries. (*Id.* at 66.) He

25  also agreed that the police reports do not indicate that the defendant was combative or

26  uncooperative with the officers. (*Id*. at 67.)

27     Defense counsel questioned Agent McGee about the CHS, specifically, whether the

28  CHS is paid for his information. Agent McGee testified that the CHS was compensated for

1    the information he provided about the defendant, as well as his meetings with the defendant.

2     (*Id.* at 68-70.)    Agent McGee confirmed that the CHS spent a good deal of time with the

3    defendant during the various meetings and "nothing unusual or bad happened to the CHS[.]"

4    (*Id.* at 72.)   Agent McGee explained that the CHS was never harmed, but the CHS did report

5    that the defendant would become extremely upset over seemingly innocuous things, such as

6    a dead battery in night vision goggles.  (*Id.*)  Agent McGee further explained that the CHS

7    did, at times, feel uncomfortable around the defendant.  (*Id.* at 73.)

8         Agent McGee agreed with defense counsel that the defendant was out and about and

9    living in the San Diego community from the time of the first meeting between the defendant

10   and the CHS in mid-April, until the defendant's arrest on June 1, 2018.  (*Id.* at 80.)   On re-

11   direct examination, Agent McGee explained that he was "concerned about the defendant

12   being on the streets," but law enforcement was not sure how many weapons the defendant

13   was making and who he was making them for, and they wanted to find out.  (*Id.* at 87.)

14   However, the risk outweighed the potential reward, which is what led to the defendant's

15   arrest on June 1, 2018.  (*Id.*)

16                                   **DISCUSSION**

17        "Federal law has traditionally provided that a person arrested for a non-capital offense

18   shall be admitted to bail." *United States v. Motamedi*, 767 F.2d 1403, 1405 (9th Cir. 1985)

19   (*citing Stack v. Boyle*, 342 U.S. 1, 4 (1951) and *United States v. Honeyman*, 470 F.2d 473,

20   474 (9th Cir. 1972)).   "Only in rare circumstances should release be denied[,]" and any

21   "[d]oubts regarding the propriety of release should be resolved in favor of the defendant."

22   *Motamedi*, 767 F.2d at 1405 (internal citations omitted).

23        "Release pending trial is governed by the Bail Reform Act which . . . mandates release

24   of a person facing trial under the least restrictive conditions or combination of conditions that

25   will reasonably assure the appearance of the person as required." *Id*.  Conversely, the Act

26   provides for the detention of a person pending trial only if a court "finds that no condition

27   or combination of conditions will reasonably assure the appearance of the person as required

28   and the safety of any other person and the community." 18 U.S.C. § 3142(e).

1   Release Factors Under the Bail Reform Act.

2        A court considers the following factors in determining whether the pretrial detention

3   standard is met: (1) the nature and circumstances of the offense charged; (2) the weight of

4   the evidence against the person; (3) the history and characteristics of the person, including

5   the person's character, physical and mental condition, family and community ties,

6   employment, financial resources, past criminal conduct, and history related to drug or alcohol

7   abuse; and (4) the nature and seriousness of the danger to any person or the community that

8   would be posed by the defendant's release. *United States v. Hir*, 517 F.3d 1081, 1086 (9th

9   Cir. 2008) (citing 18 U.S.C. § 3142(e)).  A finding that a defendant is a danger must be

10  supported by clear and convincing evidence; a finding that a defendant is a flight risk must

11  be supported by a preponderance of the evidence. *Motamedi*, 767 F.2d at 1407.[4]

12       *1.  The Nature and Circumstances of the Offense Charged*

13       The instant offenses are not violent in nature.  That said, the nature and circumstances

14  of the charged offenses are certainly serious in that the defendant has been a prohibited

15  possessor of firearms and ammunition for well over ten years, but possessed an arsenal of

16  firearms and ammunition and sold a weapon to the CHS.  Additionally, the testimony at the

17  dangerousness hearing established that the defendant manufactures the many firearms and

18  ammunition that he both possesses and sells.   Moreover, as discussed below, the defendant

19  used one of his manufactured firearms and a silencer to participate in a border militia group,

20  whose aim was to deter individuals from crossing the border illegally.

21       Based on these facts, the nature and circumstances of how these offenses were

22  allegedly committed establish that the defendant is a danger.

23       *2.  The Weight of the Evidence*

24       The weight of the evidence against a defendant is a risk factor to be considered under

25  the Bail Reform Act but it is "the least important of the various factors." *Motamedi*, 767 F.2d

26

27  ───────────────

28       [4]  The government argues that the defendant is a flight risk in addition to a danger to
    the community.  The government has not met its burden in proving that the defendant is a
    risk of flight.

- 8 -

1    at 1408.  The Ninth Circuit has held that although the Bail Reform Act:

2        permits the court to consider the nature of the offense and the evidence of
         guilt, the statute neither requires nor permits a pretrial determination that the
3        person is guilty.   These factors may be considered only in terms of the
         likelihood that the person will fail to appear or pose a danger to the
4        community.   Otherwise, if the court impermissibly makes a preliminary
         determination of guilt, the refusal to grant release could become in substance
5        a matter of punishment.

6    *Id.* at 1408 (internal citations omitted); *see also Hir*, 517 F.3d at 1090 (weight of the evidence

7    can only be considered in terms of the likelihood that the defendant would pose a danger or

8    flight risk).

9        The weight of the evidence also supports a conclusion that the defendant is a danger

10   to the community. There are recorded conversations detailing the defendant's manufacturing

11   of the firearms and ammunition, and his sale of a firearm to the CHS.  Additionally, large

12   amounts of firearms and ammunition were found both in the defendant's vehicle when he

13   was arrested and during the search of his residence.  Thus, the weight of the evidence also

14   demonstrates that the defendant is a danger.

15       *3. The Defendant's History and Characteristics*

16       The defendant is 37 years old and a lifelong resident of California.  He is married and

17   has one child from this marriage. He has one child from a prior relationship, but his parental

18   rights have been severed.  His parents and two siblings also reside in California, and he is in

19   frequent contact with them.  The defendant clearly has a lot of family support.  However, it

20   is safe to assume that his family is aware that he has prior felony convictions and cannot

21   possess firearms or ammunition.  Nevertheless, his family could not and did not stop him

22   from not only possessing firearms and ammunition, but also manufacturing them.  Thus, this

23   family support does not minimize the danger to the community which would be posed by the

24   defendant's release from custody.

25       With respect to his employment, the defendant is the founder and program director

26   of a non-profit organization called Second Chance Field, which was established in 2013. The

27   defendant performs side jobs as a handyman to earn extra income.  He was previously

28   employed as a sales manager but that employment only lasted a month.

1    The defendant suffers from chronic back issues following an injury in 2011, as well
2    as shoulder issues.  He has undergone multiple back surgeries.  He is prescribed morphine
3    three times daily, as well as another unknown medication for his back condition.

4    The defendant was diagnosed with Attention Deficit Disorder as a child and with Post
5    Traumatic Stress Disorder in 2011.  He does not participate in mental health counseling, but
6    is prescribed medication for his mental health conditions by his primary care doctor.

7    He has a substance abuse history, but it is somewhat dated.  He first used ecstasy in
8    2001, and used that substance weekly for four months.  He participated in Narcotics
9    Anonymous meetings from 2001 to 2003 while incarcerated with the U.S. Marine Corps.  He
10   stopped using alcohol in 2007.  He first used marijuana at age 26 and uses it yearly, with his
11   last use being one year ago.

12   The defendant has a fairly extensive criminal history in that he has two prior felony
13   convictions.  He was convicted via a court martial in military court on drug offenses that
14   were punishable by over a year in prison.  In 2009, he was convicted of assault resulting in
15   serious bodily injury in the United States District Court for the Northern District of
16   California.  The defendant sustained that conviction after punching and stomping on the
17   victim's head, which resulted in the victim's broken nose, fractured jaw, and concussion.
18   The defendant was also arrested on domestic violence charges which stemmed from an
19   altercation with his wife.  He threatened her with violence and  threw her on the bed.  That
20   charge did not result in a conviction, presumably because his wife did not want to press
21   charges.

22   The defendant is interested in border militia groups that patrol the border looking for
23   undocumented aliens.  He participated in a border militia operation in late January 2018, and
24   was precluded from further participation with that militia group because he wanted to use a
25   silencer on his weapon and get "hands on" with suspected undocumented aliens.  He also
26   expressed to the CHS his desire to encounter and engage drug rip crews during future border
27   surveillance operations.

28   The Court concludes that the history and characteristics of the defendant establish that

he is a danger to the community.   He has a prior conviction involving violence, and a fascination and/or obsession with firearms and ammunition even though he has been a prohibited possessor of those items for well over ten years.  He used a firearm that he manufactured in a border militia operation, and expressed a desire to continue with border operations.   He appears to have an animus against undocumented immigrants and/or Mexicans, and expressed his desire to be "hands on" with the undocumented aliens that he encounters, as well as to encounter and engage rip crews.

The Court concludes that the defendant's history and characteristics discussed above make the defendant a danger to the community.

*4.     The Nature and Seriousness of the Danger to Any Person or the Community That Would Be Posed by the Defendant's Release*

The only way to predict whether the defendant is a future danger to any person is based on the defendant's past conduct.  Here, as discussed above, the defendant's past conduct demonstrates that he is a danger to the community.  To recap, that conduct includes: (1) a felony assault conviction which makes the defendant a prohibited possessor of firearms and ammunition; (2)  a domestic violence arrest; (3) the manufacturing and possession of many firearms and ammunition; (4) the sale of at least one firearm to the CHS; (5) his animus toward undocumented immigrants and/or Mexicans; and (6) the defendant's desire to participate in border militia groups and/or operations and use violence to accomplish the goals of those groups and/or operations.

Accordingly, the Court concludes that the government has met its burden in establishing that the defendant is a danger to the community and that no conditions of release can be set to ensure the safety of the community.

DATED this 18th day of June, 2018.

Eric J. Markovich
United States Magistrate Judge