Dan H. Cooper, Bar No. 004900
COOPER & UDALL, P.C.
136 W. Simpson Street
Tucson, AZ 85701
(520) 770-1414
dcooper@cooperudall.com

Laura E. Udall, Bar No. 010501
COOPER & UDALL, P.C.
136 W. Simpson Street
Tucson, AZ 85701
(520) 770-1414
ludall@cooperudall.com

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| UNITED STATES OF AMERICA, | CR-18-01256-CKJ-JR |
| Plaintiff, | |
| vs. | **SENTENCING MEMORANDUM** |
| JOSHUA JOEL PRATCHARD, | |
| Defendant. | |

Josh Pratchard, through counsel, submits the following Memorandum in support of a variance and downward departure in the above captioned case. Josh plead to the indictment providing substantial savings to the Government by virtue of his plea. He plead to the indictment knowing that the Government intends to charge him in San Diego as well.

**INTRODUCTION**

There is no question, without reservation, that it is unsafe for guns to be in the hands of anyone that is mentally ill. It is illegal for Josh Pratchard to have guns. It is illegal for him to make guns. It was illegal for him to transfer the guns to the confidential

informant who repeatedly sought to have him sell him them. However, it is critical to note that Josh has never done anything violent with a gun.  He now faces a lengthy sentence in this case for making, possessing, and transferring guns when it is illegal for him to do so.  He is not being sentenced because he used a gun against another person or ever tried to do so.  The Government's lead detective at the detention hearing testified that the Government believed Josh was engaged in arms manufacturing but not that he had engaged in violence with a gun.  There are multiple mitigating factors which support variance and downward departure.  Those factors are set forth below.

**I.  MENTAL ILLNESS**

Mental illness is not an excuse. It is, however, an explanation. It is likely that for much of his adult life Josh Pratchard was misdiagnosed.  He was dealing with mental illness without proper help or medication. This mental illness, in large part, explains Josh's behavior in the days and weeks leading to his arrest. He was not rational and certainly acted aberrantly. If ever a variance for the mental health of a defendant is warranted it is in this case. As noted previously, mental illness is not an excuse. It does, however, explain critical aspects of Josh's behavior which seem inexplicable.

Joshua Pratchard has battled mental illness most of his life. Over the course of his life there have been numerous diagnoses.  He has seen doctors and therapists to try to deal with his mental problems.  He was first diagnosed in first or second grade due to his incessant, obsessive behavior. School psychologists felt he had attention deficit disorder and at various times he was medicated. Josh was in special education classes from a young age. He was subsequently diagnosed with an anxiety disorder as he reached high school age although his difficulty in learning remained constant. In his early twenties, Josh was diagnosed with PTSD and provided with medication. Finally, the psychiatrist at

CCA in Florence where he is currently housed diagnosed him with bipolar disorder. Josh was provided the appropriate medication and this time the medication has worked. After years of bouncing from the depths of depression to the euphoria of mania, Josh's mind is stable, in control and clear-headed.

## II.  OPIOID ADDICTION

In January of 2011, Josh Pratchard fell from a scaffolding and fractured his back. He has been in chronic pain ever since.  As was standard medical practice at the time, opioids were prescribed in massive quantities to help him deal with the agony of his injuries.  He was still on prescribed opioid medication when he was arrested for the charges in this case.  The arresting officers gave him his medication while he was being processed. Once he was taken to CCA he was detoxed for almost a week in the medical unit.  The fact that the opioid use was approved and prescribed by a licensed physician for over 7 years does not change the impact that the drugs had on his body and on his personality.  Opioid use caused wide swings of emotion.  It exacerbated Josh's mental health problems.  The addictive and destructive nature of opioids is now known.  Josh did not know the cause of his mood swings. He now is off opioids and is well aware that the opioids caused major changes in his personality.  Counsel has seen the dramatic change in Josh from the time of his arrest until now.  He is clean of the toxins of the opioids and is medicated appropriately.  The fact that he will have to use a cane or walker for the rest of his life is fine with him as he has no desire to return to the grip of prescription narcotics.

## III.   INCOMPLETE COERCION

As is set forth in the presentence report, Josh Pratchard came to the attention of the authorities when he wanted to join a civilian border patrol group.  He believed  this

was a way to give back to his country to help ensure that the border was not overrun by drugs, criminals and an invasion of illegal aliens. The appropriateness of this belief is obviously subject to debate. Josh now understands why many people are leery of such organizations. While these organizations are not illegal, they are closely monitored. In this case, the Government had a paid informant inside the organization. He was paid to provide information about individuals who joined the so-called border groups. Josh clearly wanted to participate in the organization. Most of what the Government knows about Josh's personality comes from the paid informant. This includes the claim that Josh made racist statements. Making racist statements is wrong although not illegal but Josh adamantly says he did not make those statements. He showed absolutely no intent to act on alleged racist beliefs. Simply put, Josh should not be punished on the speculation that he <u>might</u> act illegally or on the informant's claim that he made derogatory and racist remarks.

What is known for certain is that the informant stayed overnight with Josh in the desert when both of them were armed. We know that the informant lied his way into Josh's life. The informant traveled to San Diego and stayed overnight at Josh's home with his wife and son. He held the Pratchard's toddler son in his arms and made promises to Josh about the benefits of the border patrol community. The informant emphasized the money that could be made working with the border community when he knew that the Pratchards were struggling for money. The informant saw guns in the Pratchard home and relayed this information to the agents with whom he was working. If Josh Pratchard was dangerous, then the informant would have been directly in the path of that danger. The informant was in a position to assess him as a danger. He did not. The agents did not. As stated previously, the FBI agent testified at the detention hearing that

their intention was to conduct a long-term investigation of Josh for manufacturing guns.

The informant insisted that Josh cross state lines with the illegal firearms. The informant also specified the type of gun that he wanted transferred across state lines. The informant actually custom-ordered a gun that was illegal. This was not Josh's idea. It came from the the agents. Josh did exactly what the informant requested. What he did was illegal and he clearly does not have an entrapment defense. However, the facts demonstrate that it was not Josh's original intent to transfer that firearm to the informant. He was asked to do so and, even though he knew better, he did so.

**IV. CHARITABLE WORK**

Despite various physical and emotional difficulties, a low-paying job, a new marriage, and a new son, Josh has always wanted to give back to the community. He was raised in a religious household where he was taught that helping others is an essential component to living a productive life

Because Josh has been an athlete throughout his life, he recognized that sports can help shape children. He also recognized that many children live in neighborhoods with limited playground areas. Access to decent playing fields is essential for children playing sports. Josh founded a nonprofit organization, Second Chance Fields. His goal was to revitalize and revive playing fields in the San Diego area where he lived. The non-profit required hard work, sweat, and effort. Josh did the work himself and was recognized by charitable organizations for his dedication. It is one thing to simply write a check to a charity. It is quite a different thing to shovel dirt, cut grass, put up fences and pound nails.

The charitable work Josh did in San Diego is unique and demonstrates the type of person Josh can be. He did not just contribute money to a cause. He actively worked to

help others. He was awarded and recognized by the San Diego community for his work. This charitable work is yet another reason why a variance is appropriate.

### V. FAMILY SUPPORT

Josh Pratchard has not always been the easiest person to get along with. He had undiagnosed and untreated health issues as well as mood instability which became exacerbated after his addiction to prescribed opioids. However, Josh has considerable support from family and friends. Their continued support demonstrates his basic decency and caring nature as well as his enormous potential.

Josh's father has been a pastor for over thirty years and his mother is a child-care provider. His mother has recently returned to school to better her earning potential even in this extraordinarily trying time in their lives. They raised their children to be kind-hearted and giving. His mother describes Josh as having "a big heart" and remembers a time he gave his allowance to a homeless mother and daughter. His childhood friend, Britt Van Baalen, describes Josh as "caring, passionate, giving, helpful." In fact, the words of Ms. Van Baalen are echoed by friends and family. He is, to them, supportive, caring, talented and giving. A close family friend emphasizes that Josh not only has a "big heart" but has always "wanted to help people." The picture of Josh shared by family and friends is of a gentle giant who goes out of his way to help others.

As noted previously, mental illness has played a large role in Josh's life. But despite the problems he has faced, his family and friends remain supportive and concerned. This support is an obvious mitigating factor and provides assurances that in the future Josh will have people to whom he can turn. Support of family and friends is a critical factor in any form of rehabilitation and Josh has that support.

### VI. COMPARATIVE SENTENCE

A look at comparative sentences in illegal gun purchase or sale cases is instructive. Gun dealers, police officers and convicted felons have all recently been sentenced for such offenses. The sentences they received provide a guide to the appropriate sentence in the instant case. A typical sampling of recent cases includes the following:

1. January 2018: DEA supervisor, Joseph Gill, received **probation** after pleading guilty to selling firearms without a license. Gill, according to the prosecuting AUSA, sold "scores of firearms" without the required federal license. He sold weapons to people he knew "intended to use or dispose of the firearm illegally." He may not have had prior felonies but he certainly was a steward of the law and as such was held to a high standard to not only enforce but follow the law. (See Exhibit A)

2. February 2018: Ariana Alexa Ramirez, was sentenced to 30 months in prison for smuggling two AK-47 style assault rifles and ammunition **into Mexico** which were extremely dangerous weapons along with thousands of rounds of ammunition which were intended for violent acts. Acting US Attorney Strange called this a lengthy sentence. The co-defendant in the case, Adrian Alvarez, received 46 month sentence. (See Exhibit B)

3. November 2018: Justin Arch was sentenced to 40 months in prison after stealing checks from elderly assisted living facility residents and using the checks to buy

eight pistols and rifles. The AUSA in that case accused the defendant of "preying" on the elderly. The defendant admitted to trafficking firearms to drug cartels and the prosecutor called his case far more serious than most drug trafficking cases. (See Exhibit C)

4. February, 2018: Jesus Manuel Franco, a Border Patrol agent, was sentenced to 18 months in prison following his conviction at trial. Franco transferred 47 boxes of firearm parts and equipment from West Virginia to the Willcox Customs and Border Patrol station. Included in the boxes were two machine gun conversion devices. (See Exhibit D)

5. July, 2017: Tucson Police Department Officer Joe Valles received 6 ½ years in prison after pleading guilty to conspiracy to defraud the United States, aiding and abetting false statements and firearms transactions, tampering with a witness and identity theft. Valles was involved in 35 firearm transactions. Many of these weapons were known to have been transferred to Mexican drug cartels for violent use in a foreign country.   (See Exhibit E)

6. March, 2018:  Timothy Veninga, Valles' partner and co-defendant, also received 6 ½ years. Veninga attempted to cover up the crimes and lied to law enforcement on more than one occasion. Mr. Veninga owned and operated Ballistic Firearms in Tucson where he would sell guns to people who he knew were using false identification.  He sold at least 31 guns including seven rifles.   (See Exhibit F)

7. December 2012: Jaime Avila was sentenced to 57 months for his role in the gun smuggling ring involved in the botched Fast and Furious Operation which ended in the death of Border Patrol Agent Brian Terry. (See Exhibit G)

8. January 2019: Madga Luna, who had a significant criminal history, was sentenced to 51 months for smuggling numerous guns into Mexico. One of the co-defendant, received probation and the other was sentenced to less than two years. (See Exhibit H)

Josh Pratchard did not sell guns to cartels, did not knowingly sell to criminals, and possessed far fewer weapons than several of the defendants listed above.

## VII. CONCLUSION

A variance, as is a downward departure, from the guideline range is appropriate given the many factors set forth above. Josh has a stable and supportive community to assist him when he is released. He has finally found the medication to adequately treat his mental health problems. And, of equal importance, parity dictates that a variance from the guidelines is appropriate.

RESPECTFULLY SUBMITTED this 19th day of August, 2019.

By /s/ *Dan H. Cooper*
Dan H. Cooper

/s/ *Laura E. Udall*
Laura E. Udall